[Cite as *State v. Patterson*, 2016-Ohio-7130.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio, | : | |
| Plaintiff-Appellee, | : | |
| | | No. 15AP-1117 |
| v. | : | (C.P.C. No. 13CR-2122) |
| John M. Patterson, | : | (REGULAR CALENDAR) |
| Defendant-Appellant. | : | |

D E C I S I O N

Rendered on September 30, 2016

**On brief:** *Ron O'Brien*, Prosecuting Attorney, and *Sheryl L. Prichard*, for appellee.

**On brief:** *Yeura R. Venters*, Public Defender, and *George M. Schumann*, for appellant.

APPEAL from the Franklin County Court of Common Pleas

SADLER, J.

{¶ 1} Defendant-appellant, John M. Patterson, appeals from the judgment of the Franklin County Court of Common Pleas finding him guilty of felonious assault with a firearm specification. For the following reasons, we affirm.

## I. FACTS AND PROCEDURAL HISTORY

{¶ 2} This is the second appeal this court has addressed from appellant. In *State v. Patterson*, 10th Dist. No. 14AP-50, 2014-Ohio-2740, *discretionary appeal not allowed*, 141 Ohio St.3d 1489, 2015-Ohio-842, we affirmed appellant's conviction for having a weapon under disability and reversed and remanded his conviction for felonious assault and the related firearm specification for a new trial after finding the trial court erred in

failing to present a jury instruction for aggravated assault. Specifically, we stated in relevant part:

> The most challenging issue centers around aggravated assault as an offense of inferior degree as opposed to felonious assault. Minter had encountered the son of [appellant's] girlfriend on the street near where Minter lived. The boy, age seven, apparently went home and claimed to his mother that Minter had propositioned him. The mother told her boyfriend [appellant]. As a result, [appellant] believed that Minter had asked the boy to "suck his dick."
>
> Minter described [appellant] as being in a rage when [appellant] approached him. Apparently 20 minutes or more had elapsed between when Minter spoke to the seven year old and when [appellant] encountered Minter, but [appellant] had learned of the proposition more recently th[a]n that. Again, Minter described [appellant] as being in a rage when [appellant] approached him and that rage was brought on by the boy's claim of Minter propositioning him.
>
> Minter had allegedly solicited the seven-year-old boy to perform oral sex on Minter.
>
> This qualified as a serious provocation. The Supreme Court of Ohio has indicated that "[t]he provocation must be reasonably sufficient to incite the defendant to use deadly force. For provocation to be reasonably sufficient, it must be sufficient to arouse the passions of an ordinary person beyond the power of his or her control." State v. Shane, 63 Ohio St.3d 630, 635, 590 N.E.2d 272.
>
> We see the provocation as being sufficient to enrage a person who is acting in the role of step-father to a seven year old. The trial court should have allowed the jury to consider the inferior offence of aggravated assault. The first assignment of error is sustained.

*Id.* at ¶ 10-14.

{¶ 3} We subsequently denied appellee's application for reconsideration in *State v. Patterson*, 10th Dist. No. 14AP-50, 2014-Ohio-3525, stating "[a] jury could easily find that [appellant] was in a rage and the rage got visible even to Minter when Minter laughed at the accusation instead of apologizing or expressing guilt for propositioning the child.

The trial court should have let the jury decide if the appropriate charge was felonious assault or aggravated assault." *Id.* at ¶ 7-8.

{¶ 4} Thereafter, the cause came to trial on November 2, 2015. Appellee produced the following relevant evidence in its case-in-chief.

{¶ 5} Damon Minter testified to being assaulted by appellant on September 12, 2012. After recently separating from his wife, Minter returned to the neighborhood he grew up in to stay at his mother's house on East Twelfth Avenue near the airport. He left the house at approximately 1:00 p.m. to check on his community garden plot near Krumm Park and to go to the bank prior to attending a class at Columbus State. According to Minter, while walking to the community garden, he said "[h]ey, man, how are you doing?" to a young boy riding toward him on a bike. (Tr. at 31.) The boy looked at him in an angry manner and rode past him. A few minutes later, the boy on the bike appeared again, and Minter repeated his greeting. The boy responded by "curs[ing] him out" and telling Minter "[y]ou don't know me. You can't speak to me. Who do you think you are?" for about 15 to 20 seconds before pedaling away. (Tr. at 32.)

{¶ 6} Minter testified that he proceeded to the community garden and worked there for "20 minutes, no more than a half hour." (Tr. at 33.) After working at the garden, Minter headed to a bus stop but along the way stopped for approximately 45 minutes to talk to two friends he had grown up with, who were sitting in their garage at a house on the corner of Alton and Tenth Avenue. As he walked back down the driveway toward the street, a car passed him, and Minter saw that the boy he previously encountered occupied the passenger seat. The car stopped abruptly in an alley running behind the house. Minter continued walking to the bus stop, heard a "thump" sound and looked back over his shoulder. (Tr. at 36.) He saw a man, who he identified in a lineup and in court as appellant, stepping to the trunk of his car, saying "[h]ey, come here, man. Come here. Let me talk to you for a minute." (Tr. at 37.) Minter stopped at about one and one-half houses down from the alley and asked what appellant needed.

{¶ 7} According to Minter, appellant "[p]ulled a gun out, silver 9 meter – silver 9 [mm]," repeats "[c]ome here. Let me talk to you for a minute," and put the gun in his belt. (Tr. at 37.) Minter agreed to talk but asked appellant to put the gun away. He called for his friends, but they did not come. When appellant got about five or six feet away from

Minter, he said, "[y]ou the motherfucker that told my son suck his dick?" (Tr. at 38.) Minter denied saying that to his son and laughed at the question.

{¶ 8} According to Minter, appellant responded, "[y]eah, right" and put the gun barrel to Minter's forehead, again accusing Minter of propositioning young boys in a "long, nasty, profane tirade." (Tr. at 39.) Appellant moved the gun to Minter's chest and then stuck the gun in Minter's chin. All the time, Minter had his hands up. Appellant then hit Minter and continued the "crazy rhetoric" while "banging" him with his gun. (Tr. at 40.) Appellant stuck the gun in Minter's nose, then tried to stick the gun in Minter's mouth; Minter initially resisted but then realized that either he would have to open his mouth or appellant would knock his teeth out. Appellant held the gun in Minter's mouth and then pulled it out. In Minter's view, appellant was trying to "kick this fear into me * * * playing kind of like am I going to shoot you here or am I going to shoot you there. Am I going to do this?" (Tr. at 41.) Appellant resumed "banging [him] in the forehead." (Tr. at 41.) Appellant pulled his gun away but continued "running his mouth." (Tr. at 41.)

{¶ 9} According to Minter, appellant then focused on his right eye for about ten seconds and "then his face takes this rage. I mean it was rage. Honestly I never seen it in anybody. His face takes this terrible rage, and he pulls the gun back, and he throws the punch. And he throws the punch. Tried to jam that gun in my eye." (Tr. at 42.) Minter confirmed that appellant threw the punch with the same hand holding the gun. According to Minter, the barrel of the gun missed his eye directly, instead hitting Minter in the upper orbit of his eye socket then "kick[ing] up" and running the trigger guard through his eye. (Tr. at 43.) Appellant put the gun back into his belt and walked to the car but then, according to Minter, turned and told Minter to get on his knees and "run them pockets." (Tr. at 45.) Minter thought at first that appellant meant for him to run but decided not to run "because I knew that if I ran, that was going to give him an opportunity to shoot me in the back, 'cause he didn't have the courage to shoot me face up." (Tr. at 45.) Minter testified that he was familiar with what real guns look like and had no doubt that appellant brandished a "real, live gun," particularly in feeling the heavy weight of the weapon when being hit. (Tr. at 67, 68.) Eventually, appellant got back into the car and drove away. Minter testified that the boy in the car witnessed the confrontation.

{¶ 10} After briefly confronting his friends for not assisting him, Minter made his way back to Krumm Park where recreation center staff called an ambulance. According to Minter, it was 2:54 p.m. when he entered the park after the confrontation. Police arrived in a few minutes and immediately took a report. An ambulance took appellant to OSU East hospital, where staff transferred Minter to OSU Main hospital for surgery on his right eye. Minter testified that surgeons saved his eye but that he has not regained any vision.

{¶ 11} On cross-examination, Minter denied making any type of sexual or derogatory comments to the boy. He agreed that when he encountered appellant, appellant was upset and acting irate and agitated. "He was getting excited. He was just mad. He showed up. He was already at rage. He was already at 'I'm going to do something.' " (Tr. at 77.) Minter testified that appellant did not have a ring on his finger.

{¶ 12} After Minter's testimony, the parties stipulated to the prior testimony of Jean Kassem, M.D., and the transcript of Dr. Kassem's testimony was read in to the record. Dr. Kassem, an ophthalmologist for OSU, testified that Minter presented with an ophthalmic emergency known as a ruptured globe. He was taken from the emergency room into surgery to repair the globe and the surgeons also discovered and repaired a torn membrane. Dr. Kassem described the extent of the injury to the eye as "quite large," said that Minter did not have vision in his right eye, described the prognosis for Minter regaining vision as "exceedingly poor" to the point of being "unheard of," and added that his injury in his right eye puts him at risk for losing sight in the left eye later in life. (Tr. at 89, 90.)

{¶ 13} According to Dr. Kassem, when he spoke to him prior to surgery, Minter told him that he had been pistol-whipped in the eye, and, based on his examination of the eye, Dr. Kassem believed his injuries were consistent with that mechanism of injury. Dr. Kassem testified it is hypothetically possible, but less likely, that a closed fist could cause such an injury. He believed that an object rather than a fist resulted in Minter's injury because usually a fist is larger than the protection provided to the eye by the eye socket and because usually some sort of sharp object is required to tear the conjunctiva overlaying the eye. According to Dr. Kassem, it would be possible that a person with a ring on could cause such an injury, but the ring would have to be fairly large and be sharp and angular enough to go into the eye.

{¶ 14} On cross-examination, Dr. Kassem testified that Minter had a small laceration on his nose and a fracture of the nasal bone, but he did not believe a patient could sustain such an eye injury as a secondary injury to a blow to the nose. He believed that Minter's injury was more likely caused by something metal, rather than a fist, finger, or knuckle.

{¶ 15} Matthew Houser, a patrol officer for Columbus Division of Police, testified that he responded to a call to Krumm Park regarding an alleged assault. There, Houser encountered Minter, who said he had been assaulted by somebody that he had never met before and that he was struck with a chrome gun that may have been a 9 mm. Minter told Houser about the interaction he had with the boy out on the street prior to the assault and that about one-half hour after the exchange, appellant pulled up in a car and accused him of sexually propositioning the boy. Houser testified that Minter did not admit to propositioning the boy but said he greeted him. According to Houser, Minter was not evasive about the facts and acted in a manner which indicated he wanted Houser to find the person who assaulted him.

{¶ 16} After Minter was transported to the hospital, Houser and another officer, Robert Reffitt, looked around the neighborhood for the vehicle and assailant matching Minter's provided description. A few blocks away, the officers saw a car matching the description of the car driven by the assailant and a bike in the yard. A woman, T.M., opened the door of the residence. T.M. told police that the car belonged to her and that nobody else had been driving the car that day. With some prompting and in a "very nonchalant" manner, T.M. told police that her son had come home and alleged that someone had propositioned him, "[t]hat somebody—that a black male in the neighborhood had told him to suck his dick." (Tr. at 114.) She then said that she and a couple of her friends went to look for the man but could not locate him. T.M. told the officers that she had not contacted police about the incident.

{¶ 17} Reffitt testified to being with Houser in responding to Krumm Park for the alleged assault. Reffitt testified that about one week later, he was called back to T.M.'s house to investigate an alleged "hit-skip" involving a description that fit her distinctively painted car. (Tr. at 124.) T.M. gave police appellant's name as the person driving the car. Thereafter, Reffitt gave detectives appellant's name as a possible suspect in the Minter

assault case. On cross-examination, Reffitt testified that the preliminary investigation report states that the alleged assault occurred at 6:00 p.m. On redirect, Reffitt testified that the time on the report is a rough estimate based on the time the call came in to police and their interview with Minter, who he agreed appeared to be seriously injured.

{¶ 18} Michael Williams, who was a detective with the assault homicide unit on the date in question, testified to investigating the Minter case. Williams testified that Minter selected appellant out of a photo array administered by another officer and then spoke with Williams. According to Williams, during the interview, Minter described his interaction with the boy, did not admit to saying anything inappropriate to the child, talked about how the boy became angry with him, and discussed that appellant accused him of propositioning the boy. Williams described Minter as upfront, very cooperative, and very adamant about proceeding with the case. Later that month, Williams interviewed T.M. and her son. According to Williams, the boy admitted to being in his mom's car with appellant when they pulled up to confront Minter. Williams could not recall whether the boy stated he saw appellant assault Minter. The boy got very mad when Williams called appellant his father.

{¶ 19} Appellee concluded its case by calling to the stand Martin Kestner. Kestner testified to being a detective in the Columbus Division of Police assault unit during the date at issue and administering the photo array to Minter at the request of Williams. According to Kestner, Minter identified appellant and stated that he was "very confident" in his selection. (Tr. at 157.)

{¶ 20} Exhibits admitted without objection included photographs of the car, a map of the neighborhood, medical records, the photo array and instructions, and a photograph of Minter. Appellee rested its case. Appellant asked for a Crim.R. 29 dismissal of all charges, which the trial court denied.

{¶ 21} The defense commenced its case-in-chief by calling the boy involved in the incident, T.M.'s son. The boy was approximately seven years old on the date of the incident and was ten years old on the date of the trial. According to the boy, he and two of his cousins were riding their bikes to Krumm Park after school, sometime after 3:30 p.m., when a man said to him "[s]uck my dick." (Tr. at 174.) When the man said that, one of his cousins tried to take off riding, but his bike chain popped and he ran into a pole,

knocking a tooth out.  The boy fell off his own bike and started crying because of what the man said to him.  He then saw his grandma pull up to the corner and told her what had happened.  His grandma and her husband tried to talk to the man, but the man had disappeared.  His grandma took him home, and the boy told his mother what the man had said to him.  According to the boy, he and his mother rode his bike to look for the man, but they could not find the man and returned home.  Appellant, T.M.'s boyfriend, came to T.M.'s house, and T.M. told appellant about the incident.  The boy walked with appellant to look for the man, and he spotted him, Minter, at a house at the corner of the park.

{¶ 22} According to the boy, as appellant was trying to talk to Minter, Minter hit appellant and that's when appellant hit Minter back and they started fighting in the street.  The fight was short.  A bunch of cars went passed them, and Minter was gone.  According to the boy, appellant did not have a gun.

{¶ 23} On cross-examination, the boy testified that he told police about being with his cousins and thought that information was deleted off the tape of the interview with police.  He said he did not tell police that the man was talking to all three kids or that his cousin lost a tooth in trying to flee.  The boy denied simply misunderstanding something someone said on the street to him.

{¶ 24} The boy's mother, T.M., then testified on behalf of the defense.  According to T.M., her mother pulled up in front of her house on Eleventh Street at around 4:00 or 5:00 p.m., "blowing the horn screaming my name" to come outside.  (Tr. at 202.)  T.M.'s mother told T.M. that she saw a man on the corner with T.M.'s son, who was crying.  T.M.'s mother brought T.M.'s son home, and, while still crying, he told T.M. that he was on the way to the park with a couple of other kids, and the man told him to "come give him a kiss and suck his dick."  (Tr. at 205.)  T.M. rode around on her son's bike to look for the man but could not find him.

{¶ 25} T.M. testified that:

> I called [appellant] when I came back to the house, and I was upset.  And I told him what happened.  And he came to the house.  And we was all telling him what happened, and [my son] was crying.
>
> * * *

He was angry and – no.  He was screaming.

And I was like, "No, don't go."

And then he was like, "I'm going."

And then they just walked out the door.

(Tr. at 206.)

{¶ 26} T.M. said appellant dropped the boys back off at her house and left again to continue looking for the man.  She said appellant did not take her car when looking for the man and did not carry a gun.  T.M. further testified that appellant wore his grandfather's ring on the day of the incident and thought he had it on his right pinky.  Regarding the effect this incident had on her son, T.M. testified that he now has a bed-wetting problem, is emotional, and has problems in school.  T.M. moved away from the neighborhood to avoid seeing Minter.

{¶ 27} On cross-examination, T.M. testified that at the point the police were at her door, she was aware that appellant had a "confrontation" with the man but denied knowing whether they had gotten into a fight and could not remember if she knew about the fight when police interviewed her in October.  (Tr. at 216.)  She confirmed that she did not tell police about a confrontation at the October interview.  T.M. agreed that, at a previous hearing, she said appellant was not angry but now is testifying that he was angry.  In discussing why she said appellant was not angry at the previous hearing, T.M. testified:

'Cause I didn't want [appellant] to get in trouble for trying to protect my son.  He's got kids of his own.

Q.  And now you know that that's exactly what this jury has to believe. Now you know that they have to believe he was in a sudden fit of rage or passion, and so you're changing your testimony; is that right?

A.  Right.  But I told them before that he was upset.

Q. So you lied under oath at a previous hearing to protect [appellant]?

A. I didn't really lie, but, yeah.  Detectives say he wasn't never going to get out, and I was like it wasn't fair.

(Tr. at 221.)

{¶ 28} T.M. confirmed she told appellant on the phone what had happened and that appellant arrived at her house about three minutes later.  Appellant did not go right back out to look for the man but listened to her telling what happened.  Appellant then started "going crazy" and getting "loud and angry" before walking out the door to find him.  (Tr. at 222.)  On redirect examination, T.M. testified that she did tell police that her son was with neighborhood kids and, on recross examination, stated that she did not know the kids' real names, since they were not actually her nephews by blood relation and did not tell police their nicknames.

{¶ 29} Appellant's ring was admitted for the defense without objection. Both parties rested.  The trial court instructed the jury that they could consider the inferior-degree offense of aggravated assault and were provided with a verdict form as to a finding of not guilty of felonious assault and a finding of guilty of aggravated assault.

{¶ 30} The jury found appellant guilty of felonious assault with specification under R.C. 2903.11.  A sentencing hearing was held on November 5, 2015, after which the trial court imposed five years of incarceration for the felonious assault count with an additional mandatory, consecutive three-year sentence for the firearm specification. Appellant filed a timely appeal to this court.

## II.  ASSIGNMENTS OF ERROR

{¶ 31} Appellant assigns the following assignments as error:

> [1.] The verdict of guilt as to felonious assault is against the manifest weight of the evidence.

> [2.] The verdict of guilt as to the firearm specification is against the sufficiency and manifest weight of the evidence.

## III.  STANDARD OF REVIEW

{¶ 32} Sufficiency of the evidence is a legal standard that tests whether the evidence is legally adequate to support a verdict. *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997).  Whether the evidence is legally sufficient to support a verdict is a question of law, not fact.  *Id.*  In determining whether the evidence is legally sufficient to support a conviction, " '[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential

elements of the crime proven beyond a reasonable doubt.' " *State v. Robinson*, 124 Ohio St.3d 76, 2009-Ohio-5937, ¶ 34, quoting *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus.  A verdict will not be disturbed unless, after viewing the evidence in a light most favorable to the prosecution, it is apparent that reasonable minds could not reach the conclusion reached by the trier of fact.  *State v. Treesh*, 90 Ohio St.3d 460, 484 (2001).

{¶ 33} In a sufficiency of the evidence inquiry, appellate courts do not assess whether the prosecution's evidence is to be believed but whether, if believed, the evidence supports the conviction.  *State v. Yarbrough*, 95 Ohio St.3d 227, 2002-Ohio-2126, ¶ 79-80 (evaluation of witness credibility not proper on review for sufficiency of evidence); *State v. Bankston*, 10th Dist. No. 08AP-668, 2009-Ohio-754, ¶ 4 (noting that "in a sufficiency of the evidence review, an appellate court does not engage in a determination of witness credibility; rather, it essentially assumes the state's witnesses testified truthfully and determines if that testimony satisfies each element of the crime").  Further, "the testimony of one witness, if believed by the jury, is enough to support a conviction." *State v. Strong*, 10th Dist. No. 09AP-874, 2011-Ohio-1024, ¶ 42.  *See also State v. Clark*, 10th Dist. No. 15AP-926, 2016-Ohio-5493, ¶ 25.

{¶ 34} When presented with a manifest-weight challenge, an appellate court may not merely substitute its view for that of the trier of fact but must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.  *Thompkins* at 387, citing *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983).  An appellate court should reserve reversal of a conviction as being against the manifest weight of the evidence for only the most " 'exceptional case in which the evidence weighs heavily against the conviction.' "  *Id.*, quoting *Martin* at 175.

{¶ 35} In conducting a manifest weight of the evidence review, we may consider the credibility of the witnesses.  *State v. Cattledge*, 10th Dist. No. 10AP-105, 2010-Ohio-4953, ¶ 6.  However, in conducting such review, "we are guided by the presumption that the jury, or the trial court in a bench trial, 'is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the

credibility of the proffered testimony.' " *Id.*, quoting *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984). "Accordingly, we afford great deference to the jury's determination of witness credibility." *State v. Albert*, 10th Dist. No 14AP-30, 2015-Ohio-249, ¶ 14. "Mere disagreement over the credibility of witnesses is not a sufficient reason to reverse a judgment on manifest weight grounds." *State v. Harris*, 10th Dist. No. 13AP-770, 2014-Ohio-2501, ¶ 25, *appeal not allowed*, 140 Ohio St.3d 1455, 2014-Ohio-4414, citing *State v. G.G.*, 10th Dist. No. 12AP-188, 2012-Ohio-5902, ¶ 7.

## IV.  DISCUSSION

### A.  First Assignment of Error

{¶ 36} In his first assignment of error, appellant contends his conviction for felonious assault is against the manifest weight of the evidence.  Specifically, appellant argues that the jury should have found the mitigating circumstance of serious provocation and convicted appellant of aggravated assault, rather than felonious assault.  For the following reasons, we disagree.

{¶ 37} In order to find appellant guilty of felonious assault, pursuant to R.C. 2903.11, appellee had to prove beyond a reasonable doubt that appellant "knowingly * * * [c]ause[d] serious physical harm to another." R.C. 2903.11(A)(1). The offense of aggravated assault is an inferior degree of felonious assault because its elements are identical to or contained within the offense of felonious assault, coupled with the additional presence of one or both mitigating circumstances of sudden passion or a sudden fit of rage brought on by serious provocation occasioned by the victim.  *State v. Parnell*, 10th Dist. No. 11AP-257, 2011-Ohio-6564, ¶ 20, *discretionary appeal not allowed*, 131 Ohio St.3d 1539, 2012-Ohio-2025.  "Aggravated assault therefore comprises the same conduct as felonious assault, but its nature and penalty are mitigated by provocation."  *State v. Clouse*, 10th Dist. No. 11AP-857, 2012-Ohio-3471, ¶ 13.  A defendant bears the burden of proving the mitigating factor by a preponderance of the evidence.  *Id.*, citing *State v. Johns*, 10th Dist. No. 11AP-203, 2011-Ohio-6823, ¶ 20, citing *State v. Rhodes*, 63 Ohio St.3d 613 (1992), syllabus.

{¶ 38} Whether the provocation was reasonably sufficient to prompt sudden passion or a sudden fit of rage involves both an objective and a subjective analysis. *Parnell* at ¶ 23, citing *State v. Stewart*, 10th Dist. No. 10AP-526, 2011-Ohio-466, ¶ 10,

citing *State v. Shane*, 63 Ohio St.3d 630, 634 (1992). For the objective standard, the alleged provocation must be reasonably sufficient to bring on a sudden fit of rage. *Shane* at 634. For the subjective standard, the defendant in the particular case must have actually acted under the influence of sudden passion or in a sudden fit of rage. *Stewart* at ¶ 10, citing *State v. Mack*, 82 Ohio St.3d 198, 201 (1998), citing *Shane* at 634-35. "The emotional and mental state of the defendant and the conditions and circumstances that surrounded him at the time are only considered during this subjective stage of the analysis." *Parnell* at ¶ 23.

{¶ 39} In examining whether provocation is reasonably sufficient to bring on a sudden fit of passion or fit of rage, it must be sufficient to arouse the passions of an ordinary person beyond the power of his or her control. *Id.* at ¶ 24, citing *Shane* at 635. "[W]ords alone will not constitute reasonably sufficient provocation to incite the use of deadly force in most situations." *State v. Collier*, 10th Dist. No. 09AP-182, 2010-Ohio-1819, ¶ 15, citing *Shane* at paragraph two of the syllabus (words and fear alone are insufficient to demonstrate the kind of emotional state necessary to constitute sudden passion or fit of rage). Furthermore, " 'past incidents or verbal threats do not satisfy the test for reasonably sufficient provocation when there is sufficient time for cooling off.' " *Collier* at ¶ 15, quoting *Mack* at 201.

{¶ 40} Courts have indicated that a cooling off period may be a "very short time span." *State v. Caulton*, 7th Dist. No. 09 MA 140, 2011-Ohio-6636, ¶ 70, *discretionary appeal not allowed*, 131 Ohio St.3d 150, 2012-Ohio-1501, quoting *State v. Kanner*, 7th Dist. No. 04 MO 10, 2006-Ohio-3485, *discretionary appeal not allowed*, 111 Ohio St.3d 1493, 2006-Ohio-6171. *See, e.g.*, *Parnell* at ¶ 24 (15-minute period that defendant went upstairs after alleged argument a sufficient cooling off period such that aggravated assault jury instruction was not warranted); *State v. Nowden*, 2d Dist. No. 07CA0120, 2008-Ohio-5383, ¶ 59 (10- to 15-minute period defendant left residence to get a gun sufficient cooling off period); *State v. Dean*, 4th Dist. No. 15CA3499, 2016-Ohio-5720, ¶ 27 (time it took for victim to exit house and walk down the driveway approximately 100 yards away from defendant sufficient cooling off period); *State v. Byerly*, 5th Dist. No. 02-CA-81, 2003-Ohio-6911, ¶ 36, *discretionary appeal not allowed*, 102 Ohio St.3d 1424, 2004-Ohio-2003 (time it took defendant to park his car one-half mile away from victim's

residence and walk back constituted cooling off period); *State v. Shakoor*, 7th Dist. No. 01 CA 121, 2003-Ohio-5140, ¶ 105 (recognizing that in certain circumstances a few seconds may constitute a sufficient cooling off period).

{¶ 41} Appellant does not argue against the underlying elements of felonious assault, and record evidence clearly supports that the jury's determination that appellant knowingly caused serious physical harm to Minter was not in and of itself against the manifest weight of the evidence. Therefore, appellant's conviction for felonious assault will stand if appellant did not prove mitigating circumstances.

{¶ 42} Previously, in determining a jury instruction was warranted for aggravated assault in the prior appeal, we found that an alleged sexual solicitation of a seven-year-old is a serious provocation "sufficient to enrage a person who is acting in the role of step-father" to that child. *Patterson*, 2014-Ohio-2740, at ¶ 14. We continue to agree that, viewed from an objective standard, the alleged provocation is reasonably sufficient to incite a person to a sudden fit of passion or rage. Therefore, this appeal turns on evidence that would support a finding that, subjectively, appellant acted under the influence of a sudden fit of passion or rage.

{¶ 43} Here, T.M. and Minter testified to appellant's emotional state. Credibility issues undermine T.M.'s testimony, as she admitted that in the past she changed her testimony about appellant's anger to fit legal theories that would help appellant at the time. Minter testified to witnessing appellant's rage in two contexts: when appellant arrived already enraged and when appellant paused just prior to hitting him in the eye. Evidence that a person may have been enraged, alone, is not conclusive that an alleged provocation subjectively caused the person to act in a sudden fit of passion or rage beyond the power of his or her control. *Parnell* at ¶ 24.

{¶ 44} Also, assuming appellant was enraged here, the record could support a view that the fit of rage was not "sudden" as required to support mitigation and, concomitantly, that a sufficient cooling off period elapsed prior to the confrontation. R.C. 2903.12(A). The record does not clearly establish a time frame between when appellant learned about the alleged proposition and his assault of Minter. Record evidence does show that appellant learned of the prior alleged sexual proposition to his girlfriend's son through a telephone call, made about a three-minute drive to his girlfriend's house, once there did

not immediately pursue the man but listened more to his girlfriend, and drove through the neighborhood before finding Minter. Testimony exists that once he encountered Minter, appellant called to Minter "[h]ey, come here" and "[l]et me talk to you," that he went into his trunk to retrieve his gun, and after Minter laughingly denied propositioning the boy, pointed the gun in multiple places on Minter's body prior to assaulting Minter. (Tr. at 36.) Furthermore, record evidence exists that appellant later paused deliberatively before placing the destructive blow to Minter's eye.

{¶ 45} On this record, the trier of fact could have reasonably concluded that appellant was not subjectively provoked to a sudden fit of rage, that he had sufficient time to cool off from the provocation, or that he was an enraged man making deliberate choices to injure a person he believed sexually propositioned T.M.'s son rather than a man so consumed by rage that his actions were beyond the power of his control. Considering all the above, we cannot say that the trier of fact clearly lost its way and created a manifest miscarriage of justice in concluding appellant did not prove the mitigating factor by a preponderance of the evidence. Therefore, the conviction for felonious assault is not against the manifest weight of the evidence.

{¶ 46} Accordingly, appellant's first assignment of error is overruled.

**B. Second Assignment of Error**

{¶ 47} In his second assignment of error, appellant contends the jury verdict finding him guilty of the firearm specification is against both the sufficiency and manifest weight of the evidence because the evidence does not show appellant used an "operable" firearm in assaulting Minter. (Appellant's Brief at 29.) For the following reasons, we disagree.

{¶ 48} The firearm specification of the type stated described in R.C. 2941.145 permits imposition of a three-year mandatory prison term if "the offender had a firearm on or about the offender's person or under the offender's control while committing the offense and displayed the firearm, brandished the firearm, indicated that the offender possessed the firearm, or used it to facilitate the offense." R.C. 2941.145(A). "Firearm" is defined by statute to mean "any deadly weapon capable of expelling or propelling one or more projectiles by the action of an explosive or combustible propellant. 'Firearm'

includes an unloaded firearm, and any firearm that is inoperable but that can readily be rendered operable." R.C. 2923.11(B)(1).

{¶ 49} To sustain the firearm specification conviction, the state " 'must prove beyond a reasonable doubt that the firearm was operable or could readily have been operable at the time of the offense.' " *State v. Murphy*, 49 Ohio St.3d 206, 207 (1990), quoting *State v. Gaines*, 46 Ohio St.3d 65 (1989), syllabus. To do so, the state is not required to produce the actual firearm. *Murphy* at 209. Rather, "[w]hen determining whether a firearm is capable of expelling or propelling one or more projectiles by the action of an explosive or combustible propellant, the trier of fact may rely upon circumstantial evidence, including, but not limited to, the representations and actions of the individual exercising control over the firearm." R.C. 2923.11(B)(2).

{¶ 50} Appellant asserts that the evidence here falls short of the type of evidence needed to establish operability as provided in *Gaines*, *Murphy*, and *Thompkins*. Specifically, appellant argues that in the absence of testimony that appellant threatened to shoot the alleged gun and that Minter feared he would be shot, "coupled with the testimony that all the actions of [appellant] involved a beating," insufficient evidence proves that the alleged gun was operable and the finding of guilt on the specification was against the manifest weight of the evidence. (Appellant's Brief at 35.)

{¶ 51} In *Gaines*, as examples of the type of circumstantial evidence that could be used to establish the operability of a firearm, the Supreme Court of Ohio listed "testimony as to gunshots, smell of gunpowder, bullets or bullet holes, etc." *Id.* at 69. The court found, without more, non-victim witness testimony that they saw the defendant use a shiny silver or silver-plated gun and believed it was operable was insufficient proof of the firearm specification.

{¶ 52} In *Murphy*, the Supreme Court modified *Gaines* to clarify that "proof can be established beyond a reasonable doubt by the testimony of lay witnesses who were in a position to observe the instrument and the circumstances surrounding the crime." *Id.* at syllabus. As such, the court found that the totality of the circumstances, which included the gun being wrapped in a shirt, eyewitness descriptions of the instrument as one- or two-shot silver or chrome derringer, and a statement by appellant that he would kill the

clerk if he did not give him the money, established proof beyond a reasonable doubt that the appellant in that case possessed an operative firearm.

{¶ 53} Later, in *Thompkins*, the court held that "implicit threat[s] made by the individual in control of the firearm" may be used to prove a firearm specification. *Id.* at paragraph one of the syllabus. Therefore, the court found the state proved the operability of a firearm where the assailant did not expressly threaten to kill the victim, but the victim testified that during the course of a robbery the defendant pointed a black gun at her that appeared to be automatic, told her it was a "holdup" and to be "quick, quick," and she was frightened. *Id.* at 383.

{¶ 54} Since *Thompkins*, this court has specified that " '[e]ven actions alone, without verbal threats, may constitute sufficient circumstances to establish the operability of a firearm.' " *State v. Poulson*, 10th Dist. No. 09AP-778, 2010-Ohio-3574, ¶ 37, quoting *State v. Dutton*, 10th Dist. No. 09AP-365, 2009-Ohio-6120, ¶ 9. For example, in *State v. Pride*, 10th Dist. No. 11AP-55, 2011-Ohio-6055, ¶ 19-20, we held that firearm operability could be inferred where the testimony of multiple victims established that an assailant held a gun to a driver's head, hit him in the face with the gun, demanded the driver to get out of the car, and looked like he was going to shoot the victims as they drove off. *See also State v. Bryant*, 11th Dist. No. 2015-T-0100, 2016-Ohio-4928, ¶ 36-42 (finding the jury could infer that appellant was in possession of an operable firearm at the time of the offense where the victim indicated that appellant was carrying a silver gun wrapped in a bandana, pointed the gun at the victim, and used the gun to hit the victim on the back of the head).

{¶ 55} Here, the victim testified that appellant retrieved a gun from the trunk of his car, put the gun to his forehead, chin, chest, nose, and mouth, and repeatedly hit him with the gun. The victim believed appellant was trying to make him afraid of being shot and said at one point he chose not to run in order to not give appellant the opportunity to shoot him in the back. Moreover, the victim testified that he was familiar with what real guns look like, that he had no doubt that appellant brandished a "[r]eal, live gun," and testified that be believed the gun was a "silver 9 [mm]." (Tr. at 37, 68.) He noted the heavy feeling of the weapon while being hit and suffered serious wounds from the blows.

{¶ 56} Contrary to appellant's sufficiency of the evidence arguments, viewing the evidence of the record in a light most favorable to the prosecution, the actions of appellant reasonably may be interpreted as an implicit threat that the victim would be shot. The state presented sufficient evidence to support the operability of the firearm and the firearm specification conviction. Furthermore, our review of the entire record, after weighing the evidence and all reasonable inferences and considering the credibility of the witnesses, shows that the trier of fact did not clearly lose its way and create a manifest miscarriage of justice in respect to the firearm specification. Therefore, the conviction is not against the manifest weight of the evidence.

{¶ 57} Accordingly, appellant's second assignment of error is overruled.

## V. CONCLUSION

{¶ 58} Having overruled appellant's two assignments of error, we affirm the judgment of the Franklin County Court of Common Pleas.

*Judgment affirmed.*


DORRIAN, P.J., and BRUNNER, J., concur.

_____