[Cite as *State v. Robinson*, 2020-Ohio-3557.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio, | : | |
| Plaintiff-Appellee, | : | |
| | : | No. 19AP-472 |
| v. | : | (C.P.C. No. 18CR-3705) |
| Marvin R. Robinson, | : | (REGULAR CALENDAR) |
| Defendant-Appellant. | : | |

D E C I S I O N

Rendered on June 30, 2020

**On brief:** *Ron O'Brien,* Prosecuting Attorney, and *Barbara A. Farnbacher*, for appellee.

**On brief:** *Sydow Leis LLC,* and *Megan E. Grant*, for appellant.

APPEAL from the Franklin County Court of Common Pleas

NELSON, J.

{¶ 1} On July 18, 2018, someone shot A.R. outside the Sandpebble Lounge. The bullet went through A.R.'s neck, but he was not killed. A jury later heard testimony that A.R. and defendant-appellant Marvin R. Robinson had fought over a woman outside the Lounge some three days before the shooting, and that when he was released from the hospital the next day, Mr. Robinson had returned to the Lounge and told a bartender: "[A.R.] beat the [expletives deleted daylights] out of me," adding, "I'm going to [explicative] come back here and [explicative] kill him." The jury also heard from A.R., who testified unequivocally that Mr. Robinson was the person who shot him.

{¶ 2} At the end of a four-day trial, the jury found Mr. Robinson guilty of attempted murder and of felonious assault, each with a gun specification. And after a short bench trial that incorporated the earlier testimony, a judge found him guilty of the repeat violent offender specification that attached to each of those two counts, as well as of having a

weapon under disability.  The felonious assault count and its specifications merged into the attempted murder count and specifications, and the trial court sentenced Mr. Robinson to what the sentencing entry calculated as an aggregate 24 years in prison.  Mr. Robinson appeals, urging that the verdicts were against the manifest weight of the evidence and that the trial court had erred in not granting his Criminal Rule 29 motion for acquittal.  Upon review, we affirm the convictions.

{¶ 3}    "When presented with a manifest-weight challenge, an appellate court may not merely substitute its view for that of the trier of fact but must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Ndiaye*, 10th Dist. No. 19AP-10, 2020-Ohio-1008, ¶ 35; *see also, e.g., State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997) (adding that " '[t]he discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction,' " quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983)).  In undertaking this review, we acknowledge " 'the presumption that the jury * * * "is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." ' "  *State v. Kurtz*, 10th Dist. No. 17AP-382, 2018-Ohio-3942, ¶ 18 (citations omitted).

{¶ 4}    We use a different standard to assess rulings on motions for judgment of acquittal made pursuant to Criminal Rule 29.  " 'Because a Crim.R. 29 motion questions the sufficiency of the evidence, "[w]e apply the same standard of review to Crim.R. 29 motions as we use in reviewing the sufficiency of the evidence." ' " *State v. Steward*, 10th Dist. No. 19AP-35, 2019-Ohio-5258, ¶ 16, quoting *State v. Brown*, 10th Dist. No. 15AP-935, 2016-Ohio-7944, ¶ 27, quoting *State v. Hernandez*, 10th Dist. No. 09AP-125, 2009-Ohio-5128, ¶ 6. We will not disturb a verdict on insufficiency of evidence grounds " 'unless, after viewing the evidence in a light most favorable to the prosecution, it is apparent that reasonable minds could not reach the conclusion reached by the trier of fact' " of guilt beyond a reasonable doubt. *Steward* at ¶ 16, quoting *State v. Patterson*, 10th Dist. No. 15AP-1117, 2016-Ohio-7130, ¶ 32; *see also, e.g., State v. Jenks*, 61 Ohio St.3d 259 (1991),

paragraph two of the syllabus (test is "whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt"). Thus, " 'in a sufficiency of the evidence inquiry, appellate courts do not assess whether the prosecution's evidence is to be believed but whether, if believed, the evidence supports the conviction.' " *Steward* at ¶ 17, quoting *State v. Kurtz*, 10th Dist. No. 17AP-382, 2018-Ohio-2942, ¶ 16.

{¶ 5} Both prongs of Mr. Robinson's appeal as briefed go exclusively to the identity of the shooter, on which the verdicts of the jury and of the judge all hinge; the defense calls into question no other element of the offenses. *See, e.g.,* Appellant's Brief at 11 (arguing in "CONCLUSION" that "[t]here was no evidence presented proving the essential elements of the crimes charged, specifically, the identification of the perpetrator"). As Mr. Robinson's trial counsel put the matter to the trial court in making his Rule 29 motion during the jury trial, "the question does become: who could have shot [A.R.]?" April 19, 2018, Tr. at 469.

{¶ 6} By the time that defense counsel made that motion, there was, as the defense lawyer noted, "no question" but that A.R. had been shot through the neck on July 18, 2018 behind the Sandpebble Lounge. *Id.; see also id.* at 270 (A.R. testifies to having been shot). The testimony also established without contradiction and to the satisfaction of defense counsel that three days before the shooting, on July 15, there had been an "incident * * * between [Mr. Robinson] and [A.R.]" in which, still quoting defense counsel, "[A.R.] beat up [Mr. Robinson]," necessitating his being transported to the hospital. *Id.* at 396-97. Moreover, the bartender on duty the morning of July 16—the day after the fight and two days before the shooting—did testify under oath (and from a perspective the jury could assess as disinterested) that Mr. Robinson had cocked his thumb and index finger in the shape of a gun while saying, "I'm going to [blanking] come back here and [blanking] kill" A.R. *Id.* at 367-68.

{¶ 7} And A.R. testified that he had "seen exactly who it was" who shot him. *Id.* at 244 (adding that he had observed the shooter for several seconds before the gun was fired). A.R. had known Mr. Robinson "somewhat" over a period of three to four years, *id.* at 284, *see also id.* at 229-30, and the two had fought just three nights earlier, *id.* at 250. A.R. told the jury that he was "a zillion percent sure" that Mr. Robinson was the person who shot him. *Id.* at 246. While Mr. Robinson was kneeling to shoot him, A.R. had seen his face "[a]ll day," A.R. said, from roughly five yards away. *Id.* at 249. He reaffirmed on cross-

examination that he had had a clear look at Mr. Robinson as the shooter, "one Hell of a look." *Id.* at 338, 339.

{¶ 8} The jury was "free to believe 'all, part, or none of a witness's testimony.' " *State v. Ellis*, 10th Dist. No. 16AP-279, 2017-Ohio-1458, ¶ 33, quoting *State v. Raver*, 10th Dist. No. 02AP-604, 2003-Ohio-958, ¶ 21. Here, as in *State v. Merriman*, 10th Dist. No. 04AP-463, 2005-Ohio-3376, ¶ 28, "[v]iewing [the shooting victim's] testimony in a light most favorable to the prosecution, a rational trier of fact could have found beyond a reasonable doubt that defendant was the perpetrator." Even without the testimony of the bartender from July 16 regarding Mr. Robinson's announced intent to kill A.R., and even without the testimony of a second bartender that had Mr. Robinson's girlfriend (A.R.'s former girlfriend) entering the Lounge "maybe two minutes" before A.R. was shot, A.R.'s testimony alone, if credited as was the factfinders' prerogative, was enough to establish Mr. Robinson's identity as the shooter.

{¶ 9} And there is no question but that the jury was entitled to find that the shooter purposely engaged in conduct that, if successful, would have resulted in the shooter's purposely causing the death of A.R. Indeed, Mr. Robinson's trial lawyer, in arguing that his client didn't fit the bill, himself referred to "the person who attempted to murder" A.R. *Id.* at 469-70 (Rule 29 motion). By the same token, Mr. Robinson does not contest on appeal the facts established in the bench trial to the satisfaction of the court (and with no further Rule 29 motion made) that Mr. Robinson was under a disability precluding him from having or using a firearm and that, as the shooter, he would meet the repeat violent offender specification: The trial judge as factfinder was to the same extent as the jury entitled to conclude that Mr. Robinson shot A.R. with a gun, and the state presented evidence showing that he had a record from 1982 including aggravated robbery, rape, and involuntary manslaughter, along with a felonious assault conviction from 1995. June 25, 2019 Bench Trial Tr. at 7-8 and Ex. 101, 102.

{¶ 10} We overrule Mr. Robinson's second assignment of error as predicated on the trial court's denial of his Criminal Rule 29 motion for acquittal.

{¶ 11} Mr. Robinson's manifest weight of the evidence argument fares no better. Although A.R. testified that Mr. Robinson was perhaps wearing glasses and some kind of stocking cap (or, perhaps alternatively, a do-rag) at the time of the shooting, *see* Tr. at 304,

he remained adamant in his identification. Immediately after having been shot in the throat, he gave police a minimal physical identification of the shooter, without naming him (although even then, he indicated that he had seen who shot him). *See, e.g., id.* at 448, 461 (testimony of responding officer Gawronski). At trial, he explained his initial reluctance to name names as an effort to avoid "that snitching thing," *id.*, even while conceding that he contemplated taking matters into his own hands, *id.* at 248-49 ("I was going to bless the man. You know what I mean?"). But he quickly decided to work through the system, and identified Mr. Robinson by name to officers from his hospital bed two days later. *Id.* at 247, 272 (also regarding July 21, 2018 photo identification); *see also id.* at 422 (testimony of Detective Federer, recounting A.R.'s July 20, 2018 statement that he had seen Mr. Robinson shoot him).

{¶ 12} Further, and although motive is not an element of the crimes at issue, the jury could have understood the fight and the injuries that Mr. Robinson sustained on July 15 as creating an urge for revenge. That narrative is consistent with the testimony of the July 16 bartender, who was not shown to have any particular bias in the matter and who quoted Mr. Robinson as wanting A.R.'s blood. *Id.* at 366-68. Nor was Mr. Robinson's case aided by testimony that his girlfriend had appeared in the Lounge only moments before the shooting. *Id.* at 392, 399 (testimony of July 18 bartender, adding that she "normally" saw the woman in the company of Mr. Robinson).

{¶ 13} The jury was not required to find that the testimony of the two witnesses for Mr. Robinson trumped or outweighed the testimony that came before. First, Mr. Robinson's employer testified to Mr. Robinson's disabled condition two days before the shooting, and said that Mr. Robinson on July 16 had texted that he "[m]ay have to wait a day or two" before returning to work. *Id.* at 479-83. The employer had no knowledge of where Mr. Robinson was on July 18, the day of the shooting. *Id.* at 485. The second defense witness, Mr. Robinson's girlfriend, testified among other things to a July 15 telephone call from her former beau A.R. saying that he had "beat the bloody pulp" out of Mr. Robinson. *Id.* at 520. Her testimony was counter to the first bartender's, in that she said she had been with Mr. Robinson throughout July 16 from his release from the hospital onward, and that while he had gone by the Lounge in his hospital gown to retrieve his car, he had not entered in effort to reclaim his wallet (but rather made that trip the next day without incident). *Id.*

at 524-33.  She could not vouch for his whereabouts for much of July 18, but her understanding was that he had gone off to work.  *Id.* at 531.  She confirmed that she had entered the Sandpebble Lounge by the time "the back door came flying open, and a man [whose face she at first couldn't make out] was on the floor bleeding."  *Id.* at 534.  Again, to the extent that her account diverged from the bartender's testimony that Mr. Robinson had threatened murder, the factfinders were under no obligation to believe her (or even to resolve that discrepancy).

{¶ 14}  We cannot say after review of the record in this case that the factfinders clearly lost their way and that their verdicts therefore should be set aside based on the manifest weight of the evidence.  We overrule Mr. Robinson's first assignment of error.

{¶ 15}  Having overruled both assignments of error, we affirm the judgment of the trial court convicting Mr. Robinson of attempted murder, with the gun and repeat violent offender specifications, and of having a weapon while under disability.

*Judgment affirmed.*

BROWN and LUPER SCHUSTER, JJ., concur.