[Cite as *State v. Hector*, 2017-Ohio-9197.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio, | : | |
| Plaintiff-Appellee, | : | |
| | | No. 16AP-828 |
| v. | : | (C.P.C. No. 16CR-363) |
| Eugene C. Hector, | : | (REGULAR CALENDAR) |
| Defendant-Appellant. | : | |

D E C I S I O N

Rendered on December 21, 2017

**On brief:** *Ron O'Brien*, Prosecuting Attorney, and *Seth L. Gilbert*, for appellee. **Argued:** *Seth L. Gilbert*.

**On brief:** *Jeremy A. Roth*, for appellant. **Argued:** *Jeremy A. Roth*.

APPEAL from the Franklin County Court of Common Pleas

SADLER, J.

{¶ 1} Defendant-appellant, Eugene C. Hector, appeals from the judgment entry of the Franklin County Court of Common Pleas finding him guilty of aggravated robbery, robbery with associated firearm specifications, and tampering with evidence. For the following reasons, we affirm the decision of the trial court.

## I. FACTS AND PROCEDURAL HISTORY

{¶ 2} In January 2016, appellant was indicted on one count of aggravated robbery, pursuant to R.C. 2911.01, two counts of robbery, pursuant to R.C. 2911.02, and one count of tampering with evidence pursuant to R.C. 2921.12. The aggravated robbery

and robbery counts each carried a three-year firearm specification.[1]  Appellant entered a plea of not guilty.  The case proceeded to a jury trial, where plaintiff-appellee, State of Ohio, argued appellant was complicit in the January 7, 2016 armed robbery of a market.

{¶ 3}  Officer Kyle Jacobs of the Whitehall Division of Police testified that on January 7, 2016 at 10:56 p.m., he was dispatched to a Hamilton Road market regarding a robbery that had just occurred.  Jacobs, the first officer to arrive, spoke to employees of the market who were present during the robbery.  The employees were not able to provide a good description of the robbery suspect but did describe the vehicle driven by the robbery suspect as a grayish Dodge Durango.

{¶ 4}  Almareli Alcauter testified to working at the market on the evening of January 7, 2016, along with her father, Jorge Alcauter Mata, her friend, Erica Saucedo, and another girl named Yumeri.  Alcauter's daughter, who was two years old at the time, was also present in the market.  At about 10:50 p.m., with the market empty of customers, the group took a break.  Mata just sat down with his granddaughter close to the cash registers when a man walked in wearing a mask like the one worn in the movie "Scream" and holding a gun.  (Tr. Vol. 1 at 56.)  Alcauter, who was standing almost next to her dad and daughter, personally saw the gun and described it as a black, semi-automatic handgun.  Alcauter testified to being familiar with the difference between semi-automatics and revolvers.

{¶ 5}  Once in the market, the man said several times, "[p]ut your hands up.  Get on the floor," and then "[p]ut the money in the bag."  (Tr. Vol. 1 at 56-57.)  He pointed the gun at everyone while he was talking.  Alcauter attempted to push a panic button, but the alarm did not go off; she put her hands up but did not get on the floor.  When Mata tried to tell the man that an employee could not open the cash register, the man "went directly to my dad and daughter and pointed the gun to them."  (Tr. Vol. 1 at 57.)  Eventually, after about five minutes, the man got money from the cash register and ran out of the market.  Alcauter testified that after he left, they all ran out of the market to see if they could see a car.  Alcauter saw the man go into an SUV parked outside the market next to her own car; she believed the SUV was backed into the parking spot.  Alcauter believed the man's SUV

---

[1] A firearm specification on the tampering charge was indicted in error and later dismissed.

was still running because he left right away.  She testified she was "pretty sure" someone else was in the car although she could not see their face.  (Tr. Vol. 1 at 61.)  Alcauter agreed this incident was scary "because he had a gun, and he was pointing it everywhere, and then because he went directly to my daughter and my father."  (Tr. Vol. 1 at 67.)

{¶ 6}  Saucedo testified to working at the market on the night of the robbery. According to Saucedo, she was standing next to the cash register with Yumeri when the masked man entered the market and told everyone to put their hands up and get on the floor.  Saucedo looked for an alarm but could not find one.  The man told Saucedo to open the cash register, and she replied that she could not open it.  The cash register eventually opened and the man grabbed the money, shoved it into his pockets while dropping most of it on the floor, and walked out.  Saucedo did not go out into the parking lot and did not see the vehicle.

{¶ 7}  Mata testified to working at the market on the evening of the robbery.  He had just sat down with his granddaughter in his arms when the masked man came into the market, pointing and aiming a black handgun.  According to Mata, the man went to the cash registers, aimed the gun at the cash register girl, and asked for money.  When she answered Mata was the only one who was able to open the cash registers, the man came to Mata and pointed the gun at him.  The girl at the cash register was "pushing buttons left and right" and finally pushed a button that opened the register.  (Tr. Vol. 1 at 94.)  The man took some money and left the market.  Mata believed the entire incident lasted two to three minutes.  Mata testified he did not see the man get into a vehicle; by the time Mata exited the market, a greyish Dodge SUV was already running and a customer told Mata that the man was in that SUV.

{¶ 8}  Adam Hatchett testified to accepting a plea deal whereby he entered a guilty plea on the charges of aggravated robbery with the firearm specification, tampering with evidence, and five counts of receiving stolen property as well as entering a guilty plea on a prior aggravated robbery.  The plea deal includes an agreed upon sentence of 13 years incarceration and Hatchett's promise to testify truthfully regarding appellant's involvement in the market robbery.

{¶ 9}  Hatchett lived on South Hamilton Road with Melissa Poindexter, his girlfriend and mother of his children.  Hatchett characterized appellant as his cousin

through marriage and someone he has known almost his whole life. Around the time of the market robbery, Hatchett was "doing pills," specifically "Percocet 30s" without a prescription. (Tr. Vol. 1 at 104.) He would get money to support his Percocet habit from his job pay, his girlfriend, and stealing, and basically would do anything he could to avoid going through withdrawals from the drug. Hatchett and appellant would take Percocet together and had taken Xanax together a couple times.

{¶ 10} On January 7, 2016, Hatchett was trying to find money to get pills. Around 6:00 p.m., he took Poindexter's Dodge Durango and picked up appellant. According to appellant, they "rode around for a while trying to figure out a way to get some money so [they could] get some pills." (Tr. Vol. 1 at 109.) At first, they were going to try to break into cars but that did not work out. Hatchett told appellant about a prior robbery of a smoke shop that Hatchett committed by himself and suggested they try another robbery to get money. Hatchett agreed that he and appellant decided to commit a robbery together and then "cas[ed] out the [market]" by driving by it and contemplating whether or not they were going to rob it. (Tr. Vol. 1 at 110.)

{¶ 11} Eventually, Hatchett drove the car to the parking lot of the market and backed the car into a spot where they could see the front door but not the inside of the market. At that point, Hatchett and appellant watched the market to see if the customers "cleared out." (Tr. Vol. 1 at 116.) Hatchett confirmed that appellant was awake and was not asleep in the car. Hatchett testified that once all the customers cleared out, Hatchett ran inside wearing a "Scream mask" while appellant remained in the car. (Tr. Vol. 1 at 118.) According to Hatchett, the gun he used was "fake." (Tr. Vol. I at 119.) Hatchett admitted that he "waived [] around" the gun and "pointed it at people's faces" while demanding money; he thought the girl at the register was scared. (Tr. Vol. 1 at 119.) He further testified that he did see Alcauter's daughter and pointed the gun in her direction. Hatchett "can't say if [he] was threatening them or not" but was not intending to hurt them. (Tr. Vol. 1 at 120.) According to Hatchett, he got approximately $800 from the cash register, ran out of the market nearly colliding with a customer, started the SUV, and sped out of the parking lot. Appellant was in the passenger side of the vehicle still awake.

{¶ 12} Hatchett drove the SUV down Noe-Bixby Road, where he "got rid of" the mask and "fake" gun. (Tr. Vol. 1 at 125.) According to Hatchett, he asked appellant to

throw the mask out the window, which appellant did. They went to an apartment complex, and Hatchett threw his jacket in a trash can. Hatchett and appellant then drove back to Hatchett's house, and both men went into Hatchett's house and talked about what happened with Poindexter. They "split the money up" in half and called for pills. (Tr. Vol. 1 at 128.) Two pill dealers arrived at Hatchett's house and both appellant and Hatchett bought about $200 worth of pills a piece, then hung out at Hatchett's house, "did some pills," and eventually Hatchett or the pill dealers took appellant home. (Tr. Vol. 1 at 129.)

{¶ 13} Hatchett was arrested on January 12, 2016 and eventually confessed to the market robbery. Hatchett testified that he initially tried to cover for appellant but then told the "whole story." (Tr. Vol. 1 at 136.) Appellant was later arrested. According to Hatchett, when then two saw each other in a holding cell prior to a court date, appellant confronted him saying, "Oh, yeah, you're telling, your girl's telling," and then sucker punched Hatchett. (Tr. Vol. 1 at 139.)

{¶ 14} On cross-examination, Hatchett testified that on January 7, 2016, he had been doing pills all day, beginning early in the morning. He agreed pills affect his memory but testified he still remembers the robbery of the market. Regarding how appellant helped him in the robbery, appellant responded, "[h]e was with me in the car, and we just rode by and was looking at the place"; Hatchett could not recall exactly what was said word for word. (Tr. Vol. 1 at 147.) Pressed further, Hatchett elaborated, "[a]ll I know is that we was together, rode by the place, cased the place out, and I was the one who went in and committed the robbery. * * * We're both scoping the place out. * * * He helped by watching outside to make sure all the customers were gone, there was nobody else in the parking lot, there was nobody else in the building. That's how he helped me." (Tr. Vol. 1 at 147-48.) Hatchett testified they spent about 15 to 20 minutes parked outside the market before Hatchett decide to go in. The two did not have a plan for what they would do if a customer attempted to go into the market while Hatchett was inside. Hatchett confirmed appellant was not the "getaway driver." (Tr. Vol. 1 at 149.) Regarding throwing away evidence, Hatchett added that he asked appellant to throw the mask away because the passenger side of the SUV was closer to some woods along the road. Regarding the plea deal, Hatchett agreed that he would have faced the possibility of over 30 years of prison if he did not sign the agreement.

{¶ 15} Poindexter testified that she lived with Hatchett and their three children and that she has known appellant for over eight years. On January 7, 2016, sometime after she came home from work, Hatchett left alone and returned several hours later with appellant. According to Poindexter, Hatchett and appellant were "kind of amped up, excited," and laughing, and appellant said to her "[w]e're moving up in the world, Missy. We're doing big things. He's got me doing big things." (Tr. Vol. 1 at 179-80.) Hatchett pulled out a large amount of cash in small denominations and was flashing the money and pretending like he was counting it. According to Poindexter, Hatchett "handed some of it to [appellant], and then put the rest of it back inside his pocket." (Tr. Vol. 1 at 181.) Poindexter did not ask them where they got the money but "asked them to leave the room, because I didn't know what was happening, and I didn't want it to happen in front of my kids." (Tr. Vol. 1 at 181.) Hatchett and appellant went downstairs; later Poindexter heard the two pill dealers in the house. Poindexter either called or texted Hatchett and told him to leave because she did not like the pill dealers being in the house. Eventually, the pill dealers and appellant left.

{¶ 16} The next day, Poindexter was pulled over by a Gahanna police officer, and her car was impounded. On January 12th, she received a call informing her Hatchett had been taken by police and returned home to find police executing a search warrant in her home. Poindexter testified that during an initial meeting with police detectives, she was shown the market video and told police she recognized her vehicle and Hatchett. The detectives asked her if she knew appellant and she answered yes, and she did not know where he was currently staying. She spoke to Hatchett and told him to tell the truth to police. Later, she contacted a detective and told him about how she saw Hatchett and appellant with small denominations of cash.

{¶ 17} Detective John Dickey of the Whitehall Division of Police testified to investigating the robbery at the market, as well as a similar robbery that had occurred at a tobacco store a few days prior. After Poindexter's car was stopped and information was received from Gahanna police, Dickey developed Hatchett and appellant as suspects in the robbery. Eventually, Dickey got the "whole story" from Hatchett, who implicated himself and appellant. (Tr. Vol. 1 at 136.) Detectives also were able to determine that appellant was actually in the area of the market at the time of the robbery based on GPS

coordinates from his cell phone. Appellant was arrested, and, during his interview with detectives, he initially denied being with Hatchett on the night of the robbery. After being presented with his phone records, appellant told detectives he was actually with Hatchett at the market but said he basically slept in the car while the incident occurred. According to Dickey, appellant told detectives that Hatchett disposed of items used in the robbery. Detectives were not able to locate the gun or mask. Appellant confirmed that he and Hatchett bought pills later that evening.

{¶ 18} Appellee offered and the trial court admitted, without objections, the videos from the market, photographs of the market, maps of the area, photographs of the SUV, the Scream outfit, and Hatchett's plea agreement, plea form, and proffer letter. Appellee then rested its case. Appellant moved for a judgment of acquittal, pursuant to Crim.R. 29, which the trial court denied. Appellant then testified in his own defense.

{¶ 19} According to appellant, he "remembers [the event of January 7, 2016] pretty well, in and out, most parts." (Tr. Vol. 2 at 240.) After work, at about 2:30 or 3:00 p.m. in the afternoon, appellant bought a couple of Sparks, a type of alcoholic beverage, returned home, and consumed them over the next 30 minutes or so. Hatchett called him at about 4:30 p.m. and then walked over to bum a cigarette. Once with appellant, Hatchett asked whether appellant could buy him a Percocet because Hatchett was going through withdrawals. Appellant agreed and ended up buying the one Percocet for Hatchett and three Xanax for himself. Appellant testified that he ingested the three Xanax right away, around 5:45 or 6:00 p.m. Afterward, Hatchett and appellant rode around in Hatchett's girlfriend's SUV. At that point, around 6:00 or 6:30 p.m., appellant testified that he was pretty high, "[l]ike, in and out" and "nodding off" while Hatchett was driving. (Tr. Vol. 2 at 250.) He did not know why they were just driving but was "in just for the joyride." (Tr. Vol. 2 at 251.) According to appellant, he remembers Hatchett pulling into the market parking lot and sitting there for awhile; appellant thought Hatchett might be meeting someone there. Appellant testified that he "doze[d] off to sleep" and was jerked awake when Hatchett sped out of the parking lot onto Hamilton Road. (Tr. Vol. 2 at 252.) Appellant asked Hatchett what happened and Hatchett responded that he "hit a lick," which appellant took to mean that Hatchett had broken into a car and stolen something. (Tr. Vol. 2 at 254.) Appellant testified he did not throw

anything out of the car or see Hatchett throw anything out of the car and did not see a gun or mask. Instead, according to appellant, Hatchett went to an apartment building and threw something out in a dumpster. While Hatchett drove to another apartment complex, appellant continued to be in and out of consciousness. Hatchett called the pill dealers and the four of them went to Hatchett's apartment, where Hatchett proceeded upstairs; appellant and the two pill dealers remained in the living room. Hatchett then provided appellant with three more Xanax, and, a few minutes later, the pill dealers gave appellant a ride back to his apartment.

{¶ 20} Regarding his initial discussion with detectives, appellant testified he did not really remember where he was at the night of the robbery: his memory of that evening was not all that clear. He thought he was with his ex-girlfriend, but she later told appellant he was not with her the evening of the robbery but, instead, was with his sister. Appellant immediately called the detective and told him the same. During his third interview with the detective, appellant told the detective he was in Hatchett's car during the robbery.

{¶ 21} According to appellant, he never came up with a plan to rob the market, acted as a lookout, threw anything out of the SUV, or received money from Hatchett from the robbery. Appellant admitted to hitting Hatchett in the holding cell because Hatchett wrote false statements, appellant found out a child had been in the market, and appellant was in jail on his son's birthday. On cross-examination, appellant agreed he never told detectives his memory was not clear and admitted he was not truthful with detectives initially "because [he] was afraid," and told the truth after detectives presented his phone records. (Tr. Vol. 2 at 288.) Appellant then rested his case and renewed his Crim.R. 29 motion, which the trial court denied.

{¶ 22} Among its charge to the jury, the trial court instructed:

> The testimony of an accomplice did not become inadmissible because of his complicity, moral turpitude, or self-interest, but the admitted or claimed complicity of a witness may affect his credibility and may make his testimony subject to grave suspicion and require that it be weighed with great caution.
>
> It is for you as jurors, in the light of the facts presented to you from the witness stand, to evaluate such testimony and to

> determine its quality and worth or its lack of quality and worth.

(Tr. Vol. 2 at 332.)

{¶ 23} The jury found appellant guilty of all charges. After a sentencing hearing, the trial court merged both robbery counts with the aggravated robbery count and imposed a sentence of 18 months on the tampering count, 4 years for the aggravated robbery count, 3 years on the associated firearm specification, and 3 years mandatory post-release control.

{¶ 24} Appellant filed a timely appeal to this court.

## II.  ASSIGNMENTS OF ERROR

{¶ 25} Appellant presents two assignments of error:

> 1. The trial court erred when it entered judgment against Appellant when there was not sufficient evidence to support the guilty verdicts and convictions of Appellant, in violation of his due process rights under the Ohio and United States Constitutions.
>
> 2. The trial court erred when it entered judgment against Appellant when the guilty verdicts returned by the jury were against the manifest weight of the evidence in violation of his due process rights under the United States and Ohio Constitutions.

## III.  DISCUSSION

### A.  First Assignment of Error

{¶ 26} Under the first assignment of error, appellant contends the guilty verdicts and convictions are not supported by sufficient evidence against him. For the following reasons, we disagree.

{¶ 27} Sufficiency of the evidence is a legal standard that tests whether the evidence is legally adequate to support a verdict. *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997). Whether the evidence is legally sufficient to support a verdict is a question of law, not fact. *Id.* In determining whether the evidence is legally sufficient to support a conviction, " '[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.' " *State v. Robinson*, 124 Ohio

St.3d 76, 2009-Ohio-5937, ¶ 34, quoting *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus. A verdict will not be disturbed unless, after viewing the evidence in a light most favorable to the prosecution, it is apparent that reasonable minds could not reach the conclusion reached by the trier of fact. *State v. Treesh*, 90 Ohio St.3d 460, 484 (2001).

{¶ 28} In a sufficiency of the evidence inquiry, appellate courts do not assess whether the prosecution's evidence is to be believed but whether, if believed, the evidence supports the conviction. *State v. Yarbrough*, 95 Ohio St.3d 227, 2002-Ohio-2126, ¶ 79-80 (evaluation of witness credibility not proper on review for sufficiency of evidence); *State v. Bankston*, 10th Dist. No. 08AP-668, 2009-Ohio-754, ¶ 4 (noting that "in a sufficiency of the evidence review, an appellate court does not engage in a determination of witness credibility; rather, it essentially assumes the state's witnesses testified truthfully and determines if that testimony satisfies each element of the crime"). Further, "the testimony of one witness, if believed by the jury, is enough to support a conviction." *State v. Strong*, 10th Dist. No. 09AP-874, 2011-Ohio-1024, ¶ 42.

{¶ 29} Appellant challenges his convictions for aggravated robbery and robbery on the basis of complicity.[2] Ohio's aggravated robbery statute states in pertinent part:

> No person, in attempting or committing a theft offense, as defined in section 2913.01 of the Revised Code, or in fleeing immediately after the attempt or offense, shall do any of the following:
>
> (1) Have a deadly weapon on or about the offender's person or under the offender's control and either display the weapon, brandish it, indicate that the offender possesses it, or use it.

R.C. 2911.01(A)(1). The robbery statute states, in part, "[n]o person, in attempting or committing a theft offense or in fleeing immediately after the attempt or offense, shall do

---

[2] Appellant makes no argument as to his tampering with evidence conviction and, therefore, we decline to address that conviction here. "The burden of affirmatively demonstrating error on appeal rests with the [appellant]." *Miller v. Johnson & Angelo,* 10th Dist. No. 01AP-1210, 2002-Ohio-3681, ¶ 2; *see also* App.R. 9 and 16(A)(7). Pursuant to App.R. 16(A)(7), "[t]he appellant shall include in its brief, under the headings and in the order indicated, all the following: * * * [a]n argument containing the contentions of the appellant with respect to each assignment of error presented for review and the reasons in support of the contentions, *with citations to the authorities, statutes, and parts of the record on which appellant relies.*" (Emphasis added.) "It is not the duty of this court to search the record for evidence to support an appellant's argument as to alleged error." *Abraham v. BP Exploration & Oil, Inc.*, 10th Dist. No. 01AP-1061, 2002-Ohio-4392, ¶ 32.

any of the following: (1) [h]ave a deadly weapon on or about the offender's person or under the offender's control." R.C. 2911.02(A)(1). For robbery and aggravated robbery offenses predicated on the associated deadly weapon section of those statutes, "no intent beyond that required for the theft offense must be proven." *State v. Horner*, 126 Ohio St.3d 466, 2010-Ohio-3830, ¶ 40.

{¶ 30} Ohio's complicity statute, R.C. 2923.03, states in pertinent part:

> (A) No person, acting with the kind of culpability required for the commission of an offense, shall do any of the following:
>
> * * *
>
> (2) Aid or abet another in committing the offense;
>
> * * *
>
> (C) No person shall be convicted of complicity under this section unless an offense is actually committed, but a person may be convicted of complicity in an attempt to commit an offense in violation of section 2923.02 of the Revised Code.
>
> (D) If an alleged accomplice of the defendant testifies against the defendant in a case in which the defendant is charged with complicity in the commission of or an attempt to commit an offense, an attempt to commit an offense, or an offense, the court, when it charges the jury, shall state substantially the following:
>
> "The testimony of an accomplice does not become inadmissible because of his complicity, moral turpitude, or self-interest, but the admitted or claimed complicity of a witness may affect his credibility and make his testimony subject to grave suspicion, and require that it be weighed with great caution.
>
> It is for you, as jurors, in the light of all the facts presented to you from the witness stand, to evaluate such testimony and to determine its quality and worth or its lack of quality and worth."

{¶ 31} "To support a conviction for complicity by aiding and abetting pursuant to R.C. 2923.03(A)(2), the evidence must show that the defendant supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the

crime, and that the defendant shared the criminal intent of the principal." *State v. Johnson*, 93 Ohio St.3d 240 (2001), syllabus. Such intent may be inferred from the circumstances surrounding the crime, including presence, companionship, and conduct before and after the offense is committed. *Id. State v. Noor*, 10th Dist. No. 13AP-165, 2014-Ohio-3397, ¶ 45 ("In order to be convicted of complicity in the commission of aggravated robbery, [appellee must prove] that appellant, with purpose to deprive the owner of property or services, knowingly aided or abetted [the principal] in committing the same."). Thus, an innocent bystander or person "who merely 'associates' with another" in the commission of a crime does not aide and abet under Ohio law. *State v. Sims*, 10 Ohio App.3d 56 (8th Dist.1983), paragraph two of the syllabus; *Johnson* at 243, citing *State v. Widner*, 69 Ohio St.2d 267, 269 (1982).

{¶ 32} Whoever violates R.C. 2923.03 is guilty of complicity in the commission of an offense and "shall be prosecuted and punished as if he were a principal offender. A charge of complicity may be stated in terms of this section, or in terms of the principal offense." R.C. 2923.03(F).

{¶ 33} Appellant first contends that no evidence in the record exists to prove appellant aided or abetted in the commission of the robbery of the market. He argues that he was simply a passenger in the vehicle that Hatchett used to commit the robbery and was not conscious when the robbery occurred. Thus, unlike in *Johnson*, his mere presence in the vehicle does not rise to the level of conduct required to sustain a conviction under the complicity statute.

{¶ 34} As discussed in *Johnson*, the purpose of requiring the state to prove a defendant supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the crime and shared the criminal intent of the principal "is to protect innocent bystanders who have no connection to the crime other than simply being present at the time of its commission." *Id.* at 243. In this case, appellee produced ample evidence to meet its burden. Hatchett's testimony, if believed, established that appellant discussed robbing the market with Hatchett as a means to get money to buy pills, "cas[ed]" the market first by driving by it and then watching the market from the parking lot for about 15 to 20 minutes to ensure customers had cleared out, assisted with disposing of the mask and gun, and split the proceeds of the robbery. (Tr. Vol. 1 at 110.)

Poindexter's testimony, if believed, establishes Hatchett gave appellant low denominations in cash on the night of the robbery, appellant appeared to be excited about that evening's events, and pill dealers were in their house after Hatchett and appellant returned. We find this to be sufficient evidence to establish appellant assisted and cooperated with Hatchett in the commission of the crime, and appellant shared the criminal intent of Hatchett.

{¶ 35} Appellant next contends that evidence was insufficient to support the firearm specification. The firearm specification of the type stated described in R.C. 2941.145 permits imposition of a three-year mandatory prison term if "the offender had a firearm on or about the offender's person or under the offender's control while committing the offense and displayed the firearm, brandished the firearm, indicated that the offender possessed the firearm, or used it to facilitate the offense." R.C. 2941.145(A). "Firearm" means any deadly weapon capable of expelling or propelling one or more projectiles by the action of an explosive or combustible propellant. R.C. 2923.11(B)(1). "Firearm" includes an unloaded firearm and any firearm that is inoperable but that can readily be rendered operable. R.C. 2923.11(B)(1).

{¶ 36} Thus, to sustain the firearm specification conviction, the state " 'must prove beyond a reasonable doubt that the firearm was operable or could readily have been operable at the time of the offense.' " *State v. Murphy*, 49 Ohio St.3d 206, 208 (1990), quoting *State v. Gaines*, 46 Ohio St.3d 65 (1989), syllabus. To do so, the state is not required to produce the actual firearm. *Murphy* at 209. Rather, "[w]hen determining whether a firearm is capable of expelling or propelling one or more projectiles by the action of an explosive or combustible propellant, the trier of fact may rely upon circumstantial evidence, including, but not limited to, the representations and actions of the individual exercising control over the firearm." R.C. 2923.11(B)(2).

{¶ 37} For example, in *Thompkins*, the Supreme Court of Ohio held "implicit threat[s] made by the individual in control of the firearm" may be used to prove a firearm specification. *Id.* at paragraph one of the syllabus. This court has noted that since *Thompkins*, " ' "[e]ven actions alone, without verbal threats, may constitute sufficient circumstances to establish the operability of a firearm." ' " *State v. Patterson*, 10th Dist. No. 15AP-1117, 2016-Ohio-7130, ¶ 54, quoting *State v. Paulson*, 10th Dist. No. 09AP-778,

2010-Ohio-3574, ¶ 37, quoting *State v. Dutton*, 10th Dist. No. 09AP-365, 2009-Ohio-6120, ¶ 9. For example, in *Dutton*, we cited, in pertinent part, the following list of examples:

> *Thompkins* (the defendant pointed a gun directly at the robbery victim and told her it was a holdup and to be quick, in response to which she handed over money from the cash register). In *State v. Melton*, 2d Dist. No. 22591, 2009-Ohio-535, the defendant forced his way into the victim's home, told her to "shush," then pulled out a gun and proceeded to steal jewelry from the bedroom. Because the victim believed the gun was real, she feared for her safety and complied with the defendant's demands. The court found the evidence was sufficient to support the firearm specification. *Id.* at ¶ 18, 36. *See also State v. Sanders* (1998), 130 Ohio App.3d 92, 101, 719 N.E.2d 619 (the gun was pointed at a victim when she was ordered out of her car and the defendant cocked the gun and pointed it at another victim when taking that victim's money); *State v. McElrath* (1996), 114 Ohio App.3d 516, 520, 683 N.E.2d 430 (defendant pointed gun at customers and bartender while another man took cash from the register); *State v. Pierce*, 10th Dist. No. 02AP-1133, 2003-Ohio-4179, ¶ 20 (defendant pointed gun at victim through a car window while demanding money); *State v. Jackson*, 10th Dist. No. 02AP-468, 2003-Ohio-1653, ¶ 44-45 (defendant pulled gun and held it to the victim's head while demanding money); *State v. Macias*, 2d Dist. No. 1562, 2003-Ohio-1565, ¶ 15 (defendant pointed what appeared to be a real gun at the victim while demanding money).

*Id.* at ¶ 9.

{¶ 38} Furthermore, "[i]n Ohio, there is no error in finding an accomplice guilty of a firearm specification when the accomplice was unarmed and unaware that an accomplice possessed a firearm." *State v. Dickerson*, 11th Dist. No. 2013-A-0046, 2015-Ohio-938, ¶ 39. *State v. Kimble*, 7th Dist. No. 06 MA 190, 2008-Ohio-1539, ¶ 41; *State v. Burkett*, 11th Dist. No. 2009-P-0069, 2010-Ohio-6250, ¶ 42. Rather, if the evidence shows that a defendant was complicit in robbing the market and the principal possessed a gun, the defendant is guilty of the firearm specification. *Dickerson* at ¶ 39; *State v. Howard*, 8th Dist. No. 97695, 2012-Ohio-3459, ¶ 24.

{¶ 39} Appellant in this case makes two arguments against the sufficiency of the evidence for his specification conviction. First, appellant contends the record contains no evidence he knew Hatchett had a firearm. Second, appellant contends the gun possessed by Hatchett was not a "firearm" for purposes of R.C. 2941.145(F) under the definition of R.C. 2923.11 because evidence was not sufficient that the device used was capable of expelling projectiles or was readily operable. Specifically, appellant asserts the evidence here is in line with *Gaines*, in which testimony concerning the appearance of the gun and the witnesses' subjective belief regarding the gun being operable fell short of the type of evidence needed to establish operability and asserts that this case is distinguishable from *Murphy* and *Patterson* because Hatchett did not make a statement to the clerks which would indicate operability or physically use the gun to strike or harm the clerks.

{¶ 40} Regarding appellant's first argument, as stated above in *Dickerson*, there is no error in finding an accomplice guilty of a firearm specification when the accomplice was unarmed and unaware that an accomplice possessed a firearm. *Id.* at ¶ 39. If the evidence shows the defendant was complicit in the crime and the principal possessed a gun, the defendant is guilty of the firearm specification. *Id.* Therefore, appellant's first argument regarding his alleged lack of knowledge of the gun is irrelevant and lacks merit.

{¶ 41} We likewise disagree with appellant's second argument. Appellee produced sufficient evidence that the gun possessed by Hatchett was a "firearm" for purposes of R.C. 2941.145(F) under the definition of R.C. 2923.11. Although Hatchett testified the gun was fake, Alcauter testified she was familiar with guns and described the gun specifically as a black semi-automatic handgun. Alcauter and Mata testified that Hatchett pointed the gun at each of them while demanding money, and Alcauter was scared in particular when Hatchett pointed the gun at her father and young daughter, which Hatchett admitted doing. While appellant alludes to matters of credibility, that consideration is not appropriate under our sufficiency of the evidence review. *Yarbrough* at ¶ 79-80. Appellee also produced evidence Hatchett pled guilty to the firearm specification, and we have already found sufficient evidence appellant was complicit in the crime. Therefore, because the evidence shows appellant was complicit in robbing the market and the principal possessed a firearm, appellant is guilty of the firearm specification. *Dickerson* at ¶ 39.

{¶ 42} Considering all the above, after reviewing the evidence contained in the record in a light most favorable to the prosecution, we conclude appellee satisfied its burden of production, and a rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Therefore, the evidence is sufficient to support appellant's convictions.

{¶ 43} Accordingly, appellant's first assignment of error is overruled.

**B.  Second Assignment of Error**

{¶ 44} Under the second assignment of error, appellant contends the guilty verdicts returned by the jury are against the manifest weight of the evidence. For the following reasons, we disagree.

{¶ 45} When presented with a manifest-weight challenge, an appellate court may not merely substitute its view for that of the trier of fact but must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *Thompkins* at 387, citing *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983). An appellate court should reserve reversal of a conviction as being against the manifest weight of the evidence for only the most " 'exceptional case in which the evidence weighs heavily against the conviction.' " *Id.*, quoting *Martin* at 175.

{¶ 46} In conducting a manifest weight of the evidence review, we may consider the credibility of the witnesses. *State v. Cattledge*, 10th Dist. No. 10AP-105, 2010-Ohio-4953, ¶ 6. However, in conducting such review, "we are guided by the presumption that the jury, or the trial court in a bench trial, 'is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony.' " *Id.*, quoting *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984). "Accordingly, we afford great deference to the jury's determination of witness credibility." *State v. Albert*, 10th Dist. No 14AP-30, 2015-Ohio-249, ¶ 14. "Mere disagreement over the credibility of witnesses is not a sufficient reason to reverse a judgment on manifest weight grounds." *State v. Harris*, 10th Dist. No. 13AP-770, 2014-Ohio-2501, ¶ 25, *appeal not allowed*, 140 Ohio St.3d 1455, 2014-Ohio-4414, citing *State v. G.G.*, 10th Dist. No. 12AP-188, 2012-Ohio-5902, ¶ 7.

{¶ 47} In this case, appellant argues the jury verdicts are against the manifest weight of the evidence in regard to his role as an aider and abetter since the "only evidence which allegedly supports Appellant's role in the commission of the offenses is the testimony of * * * Hatchett," whose testimony, as the principal offender, is subject to "grave suspicion, and should be weighed with great caution" and lacked specificity as to actions, conversations, and planning on the part of appellant.  (Appellant's Brief at 28, 29.)

{¶ 48} While we agree that Hatchett's testimony must be viewed with grave suspicion and weighed with great caution pursuant to R.C. 2923.03(D), we disagree that reversal is merited on the record of this case.  First, Hatchett's testimony was not the only evidence to support appellant's guilty verdicts.  Poindexter testified she saw appellant and Hatchett split cash on the evening of the robbery, and appellant told her Hatchett has "got me doing big things."  (Tr. Vol. 1 at 180.)  Second, appellant suffered from significant credibility problems.  Appellant only admitted to police he was in the SUV with Hatchett after police showed him his phone records, and, at trial, he admitted to changing his story several times to police detectives.  At trial, appellant explained his changing story by asserting his recollection of the evening was not clear, even after he asserted the opposite in testifying he definitively did not assist in the robbery.  Third, the jury was charged with the cautionary directive stated in R.C. 2923.03(D) regarding the testimony of an accomplice.  "A jury is presumed to have followed the instructions given to it by the court."  *State v. Fowler*, 10th Dist. No. 15AP-1111, 2017-Ohio-438, ¶ 23 (10th Dist.).  Based on its finding of guilt after having personally viewed both appellant and Hatchett on the stand, the jury presumably gave more credence to the testimony of Hatchett despite knowing his role in the robbery, his plea deal, and the statutory warning.  The jurors were in the best position to judge the demeanor and statements of both men.  *Cattledge* at ¶ 6.  Even if we were to disagree with the jury's assessment of Hatchett, disagreement regarding credibility of witnesses is not a sufficient reason to reverse a judgment on manifest weight grounds.  *Harris* at ¶ 25.

{¶ 49} Our review of the entire record, after weighing the evidence and all reasonable inferences and considering the credibility of the witnesses, shows the trier of fact did not clearly lose its way and create a manifest miscarriage of justice in respect to

appellant's guilty verdicts.  Therefore, the verdicts of the jury are not against the manifest weight of the evidence.

{¶ 50}  Accordingly, appellant's second assignment of error is overruled.

## IV.  CONCLUSION

{¶ 51} Having overruled appellant's two assignments of error, we affirm the judgment of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

TYACK, P.J., and LUPER SCHUSTER, J., concur.

_____