[Cite as *State v. Clark*, 2016-Ohio-5493.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio, | : | |
| Plaintiff-Appellee, | : | |
| | | No. 15AP-926 |
| v. | : | (C.P.C. No. 14CR-3495) |
| Davonte Clark, | : | (REGULAR CALENDAR) |
| Defendant-Appellant. | : | |

D E C I S I O N

Rendered on August 23, 2016

**On brief:** *Ron O'Brien*, Prosecuting Attorney, and *Laura R. Swisher*, for appellee. **Argued:** *Laura R. Swisher*.

**On brief:** *The Law Office of Thomas F. Hayes. LLC* and *Thomas F. Hayes*, for appellant. **Argued:** *Thomas F. Hayes*.

APPEAL from the Franklin County Court of Common Pleas

BRUNNER, J.

{¶ 1} Defendant-appellant, Davonte Clark, appeals a judgment of the Franklin County Court of Common Pleas sentencing him to serve a total of 35 years following guilty verdicts in a jury trial on counts of felonious assault, rape, and kidnapping. Because we find that the evidence with respect to Clark's conviction for rape is insufficient, we sustain his assignment of error and modify the judgment entry of the trial court to remove the 14 years imposed on the rape convictions (7 years each, leaving a remaining total of 21 years) and remand for consideration of whether Clark should continue to be required to register as a sex offender as to his kidnapping convictions absent the rape convictions.[1] Because

---

[1] The sentencing entry does not mention sex offender registration. However, the transcript of the sentencing hearing indicates that Clark was notified at sentencing that he will be subject to sex offender registration, and he executed a form, filed in the record of the trial court, acknowledging his duty to register. The trial court judge also signed the form affirming that Clark was advised of the requirement to register.

No. 15AP-926

Clark's remaining assignments of error also concern his convictions for rape, they are rendered moot by our disposition of the first assignment of error and are not considered.

## I. FACTS AND PROCEDURAL POSTURE

{¶ 2} On July 2, 2014, Clark was indicted (in addition to three other co-defendants[2]) for one count of aggravated robbery, six counts of felonious assault, six counts of rape, and two counts of kidnapping. He pled not guilty on July 7, 2014 and ultimately exercised his right to a jury trial.

{¶ 3} The State tried Clark and his three co-defendants in a single proceeding that began on August 3, 2015. At the outset of the trial, the defense stipulated that DNA was properly collected and firearms found at the scene were operable. In addition, one of the two alleged victims in the case, B.P., had not responded to the subpoena, and the State, therefore, sought and received a warrant for his arrest. Following opening statements, the State began to call witnesses.

{¶ 4} The State first called a Columbus police officer. The officer testified that on June 25, 2014, at 2:24 a.m., he was dispatched to Mount Carmel West Hospital where he spoke to a female victim, A.B. He testified that A.B. appeared shaken but the officer admitted he did not know of what she was afraid. Neither A.B. nor the other alleged victim, B.P., had (to his knowledge) called the police and A.B. did not name anyone who might have hurt her.

{¶ 5} The second witness was also a Columbus police officer. He testified that he picked up A.B. from the hospital for the purpose of identifying a residence on North Harris Avenue where some events relevant to the case were alleged to have transpired. The officer testified that the residence in question was 125 North Harris Avenue.

{¶ 6} The State next called a detective from the crime scene search unit of the Columbus Division of Police. This witness identified photographs taken at 125 North Harris Avenue as well as items of physical evidence recovered. Among the photographs were depictions of a broom with a pole-style handle, a broom handle without a broom end attached, a blue bucket containing a leather belt and a BB gun, a dog cage in a basement, a

---

[2] One of these co-defendants was ultimately not convicted of any offenses, and thus, he is not named. Discussion in this decision is limited to the three defendants who were convicted of crimes concerning the incidents in question.

black and silver handgun, three boxes of ammunition, a number of cell phones, a rifle, and a rifle clip.

{¶ 7} The State then called A.B. as a witness. A.B. testified that she had been, for a period of approximately six years, addicted to heroin but, as of the date of her testimony on August 4, 2015, she had been clean for approximately one year. She explained that she had been acquainted with one of Clark's co-defendants, Ivan Minor, for around five years, and that she and her boyfriend, B.P., went weekly to Minor's house on North Harris Avenue to buy heroin.

{¶ 8} A.B. related that on June 24, 2014, she and B.P. went to the North Harris Avenue house. A.B.'s testimony varied on the exact sequence of events, whether she and B.P. had been there earlier in the day, whether B.P. was intending to apply a tattoo at the residence or trade tattooing equipment for heroin, and whether someone called to her from within the house or whether someone called to B.P. However, she testified that once she was inside the house, someone, she was not sure who, displayed a weapon and told her to go in the kitchen, empty her pockets, and strip. Apparently, heroin had gone missing and the people in the house on North Harris Avenue thought she and B.P. had taken it.

{¶ 9} Once she and B.P. had complied in disrobing, someone, she was not sure who, performed cavity searches on her and B.P. in the kitchen. Some time later, she and B.P. were taken into the basement of the house where one of Clark's co-defendants and other unidentified persons also performed anal and vaginal cavity searches on her using gloves from A.B.'s purse which she had for tattooing purposes. In the basement, a number of unidentified persons, not believing A.B. and B.P.'s protestations that they had not stolen heroin, began to beat B.P.

{¶ 10} The beating began with a bottle but they also used a BB gun, a leather strap, a knife, as well as feet and hands. A.B. was able to identify the BB gun, bucket, and strap offered into evidence among the State's trial exhibits. Specifically, A.B. testified that some people (whom she simply referred to as "they") broke the bottle on B.P.'s head, stomped him with their feet, hit him with their hands, wetted the leather strap and whipped his back with it, smashed his toes with the butt of the BB gun, and shot him in the bottom and the genitals with the BB gun. (Tr. Vol. 2 at 128-30.) They also forced B.P. into a dog cage

and sodomized him anally with a broom handle without a broom attached to it. At times when B.P. passed out, they dumped cold water on him to revive him for further beatings. Also, while B.P. was in the cage, they were heating up a knife tip and branding him with it. In addition, A.B. testified that, someone (she did not know who) kicked her in the head a couple of times when the beating first started.

{¶ 11} At no time did A.B. identify who did what during the beatings except to say that Clark and one of his co-defendants, Minor, stomped B.P. and hit him with their hands. A.B. estimated that she was kept in the basement for at least six hours before she was allowed to leave. She did not attempt to leave or check if the door was locked. However, according to her testimony, Clark and his three co-defendants came downstairs at points to make sure she and B.P. were down there. She also said someone recorded a video of her, naked on top of B.P.'s cage, urinating on him.

{¶ 12} Toward the end of the night, someone gave A.B. some heroin and B.P. some meth to help with their pain and withdrawal sickness. Eventually, the captors let A.B. and B.P. go free reasoning that it had begun to rain outside and any heroin that A.B. and B.P. might have stolen and stashed outside would be ruined. At least Minor, and maybe other persons, warned A.B. and B.P. not to call the police. When she retrieved her belongings and got dressed, A.B. was missing three cell phones and $30. However, neither she nor B.P. called the police. Instead, they walked to a friend's house who, when it was apparent that B.P.'s health was poor, took them to Mount Carmel West Hospital.

{¶ 13} A.B. was able to identify all four defendants at trial, including Clark. However, she admitted on cross-examination that she was in heroin withdrawal during the ordeal and that heroin has a mind-altering effect that can make things seem real that are not. She explained that neither Clark nor his co-defendant, Charles Reed, had raped or assaulted her. She had no memory of speaking to nurses at the hospital or relating that she had been penetrated.

{¶ 14} The next grouping of witnesses was composed of staff from Mount Carmel West Hospital; three sexual assault nurses who collected forensic observations and took photographs of the injuries sustained by A.B. and B.P. and a resident physician who treated B.P. According to the physician's testimony, B.P. presented with numerous lacerations, a broken rib, a collapsed left lung, a ruptured spleen rating 4 of 5 on the

severity scale, a broken toe, a fractured tailbone, a bruised scrotum, and abrasions around his anus. He was admitted to the intensive care unit and remained there for 5 days. The forensic nurse manager for Mount Carmel Health System also testified, describing the photographed injuries to B.P. and authenticating the exhibits showing injuries.

{¶ 15} Another nurse testified that she performed an exam of A.B. and testified to bruising and other minor injuries to A.B. visible in photographs. This nurse testified that A.B. told her that fingers had been used to penetrate her vaginal area and "butt." (Tr. Vol. 2 at 458.) The nurses also testified that they swabbed areas where foreign DNA might have been present based on the history recounted by A.B. and B.P. and preserved the rape kit for the police.

{¶ 16} The State next called a DNA expert forensic scientist with the Ohio Bureau of Criminal Investigation. According to the expert, DNA tests were run on the rape kits collected from A.B. and B.P., as well as numerous articles found at the scene like the broom handle, BB gun, and pistol. No foreign DNA sufficient for comparison with conventional DNA testing was found in the rape kits or on any of the articles except the BB gun. And Minor, Clark, and Reed could be excluded as contributors to the DNA mixture obtained from the BB gun. The expert testified that Y-STR DNA testing yields a less exact result. The testing produced two DNA profiles on one end of one broom handle, a major and a minor profile. The major profile was consistent with B.P. but Minor, Clark, and Reed were all excluded as contributors to the minor profile.

{¶ 17} Thereafter, a canine handling officer for the Columbus Division of Police testified that on June 25, 2014, he was called to 125 North Harris Avenue at 6:24 a.m. with the SWAT team to help effect an arrest because despite the police having announced their presence, people were not coming out of the house. He testified that after about 15 or 20 minutes, Reed jumped from the second floor window and began limping toward him and a SWAT officer. Because Reed did not immediately get on the ground when ordered to do so, the SWAT officer hit him with the barrel of his rifle and they arrested him. Other than Reed, everyone else who was in the house came out in an orderly and respectful fashion with their hands raised.

{¶ 18} The final witness called by the State was an expert in cell phone analysis with the Columbus Division of Police. He testified that a detective assigned to the case

presented him with an Apple iPhone 4 and asked him to obtain the phone's contents. He was able to use software to bypass the phone's security code and download the contents. Both the Apple ID and the Kik[3] ID information on the phone were associated with the name "Charles Reed." (Tr. Vol. 3 at 575-77.) The expert explained that, from his review of the phone's contents, he was able to determine that on June 24, 2014, at 5:18 p.m., a text was sent from the iPhone to a recipient named "Destiny" which said, "I am on Harris." (Tr. Vol. 3 at 578.) Then at 1:05 a.m. on June 25, the iPhone received a message that said, "[d]id that situation resolve itself at Harris?" (Tr. Vol. 3 at 579.) In addition, the iPhone contained a video showing A.B. naked in front of a dog cage appearing to urinate on B.P. The expert explained that while he could not say that this particular phone took the video, he could discern that the video was taken by the same model of phone running the same edition of the operating system, that the video was taken on June 24, 2014, at 4:46 p.m., and that it was taken at the house on North Harris Avenue.

{¶ 19} Following the last of its witnesses and the admission of exhibits, the trial court heard motions by the defendants for acquittal under Crim.R. 29. The State admitted that the evidence was insufficient on three counts of the indictment as to all defendants and the trial court dismissed those counts.

{¶ 20} After closing arguments, jury instructions, and deliberations, on August 11, 2015, the jury returned verdicts. The jury found Minor, Reed, and Clark each guilty of five counts of felonious assault and two counts of kidnapping. It also found that Minor and Clark were each guilty of two counts of rape. It found all four defendants not guilty on all remaining counts.

{¶ 21} On September 10, 2015, the trial court held a sentencing hearing. The trial court, after a lengthy explanation of the factors and purposes of sentencing, sentenced Clark to a total of 35 years in prison. Specifically, the trial court determined that the felonious assault counts should merge and sentenced Clark to 7 years on the merged count, 7 years on each of the 2 rape counts, and 7 years on each of the 2 kidnapping counts, each to be served consecutively to the others.

{¶ 22} Clark now appeals.

---

[3] Kik is a messaging application.

No. 15AP-926

## II. ASSIGNMENTS OF ERROR

{¶ 23} Clark raises four assignments of error for review:

[I.] Mr. Clark's convictions on Counts 8 and 9 (complicity in two rapes of [A.B.]) are not supported by legally sufficient evidence and are contrary to the manifest weight of the evidence.

[II.] The errors in the jury's verdicts on Counts 8 and 9 violated Mr. Clark's constitutional guarantee of due process and protection against double jeopardy.

[III.] The trial court failed to merge Mr. Clark's convictions on Counts 8 and 9 pursuant to R.C. 2941.25.

[IV.] Mr. Clark was deprived of effective assistance of counsel by the failure to advocate for merger of Counts 8 and 9.

## III.  DISCUSSION

### A. First Assignment of Error—Whether the Rape Convictions were Sufficiently Supported by the Evidence and Whether they were Contrary to the Manifest Weight of the Evidence

{¶ 24} In his first assignment of error, Clark alleges that his convictions were not supported by sufficient evidence and that they were against the manifest weight of the evidence.  The Supreme Court of Ohio has "carefully distinguished the terms 'sufficiency' and 'weight' * * *, declaring that 'manifest weight' and 'legal sufficiency' are 'both quantitatively and qualitatively different.' " *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 10, quoting *State v. Thompkins*, 78 Ohio St.3d 380 (1997), paragraph two of the syllabus.

{¶ 25} Sufficiency is:

"[A] term of art meaning that legal standard which is applied to determine whether the case may go to the jury or whether the evidence is legally sufficient to support the jury verdict as a matter of law." * * * In essence, sufficiency is a test of adequacy. Whether the evidence is legally sufficient to sustain a verdict is a question of law.

*Eastley* at ¶ 11, quoting *Thompkins* at 386; *Black's Law Dictionary* 1433 (6th Ed.1990). "In reviewing a record for sufficiency, '[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have

found the essential elements of the crime proven beyond a reasonable doubt.' " *State v. Monroe*, 105 Ohio St.3d 384, 2005-Ohio-2282, ¶ 47, quoting *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus.

{¶ 26} By contrast:

> Weight of the evidence concerns "the inclination *of the greater amount of credible evidence*, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict * * *. Weight is not a question of mathematics, but depends on its *effect in inducing belief.*"

(Emphasis sic.) *Eastley* at ¶ 12, quoting *Thompkins* at 387; *Black's* at 1594. For a manifest weight analysis "the appellate court sits as a 'thirteenth juror' and disagrees with the jury's resolution of the conflicting testimony." *Thompkins* at 388, quoting *Tibbs v. Fla.*, 457 U.S. 31, 42 (1982). " 'The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.' " *Id.* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983).

{¶ 27} There are also noteworthy differences in how the two concepts are treated procedurally. While a majority of a reviewing court may find that evidence was insufficient, "[n]o judgment resulting from a trial by jury shall be reversed on the weight of the evidence except by the concurrence of all three judges hearing the cause." Ohio Constitution, Article IV, Section 3(B)(3); *Thompkins* at 380, paragraphs three and four of the syllabus. In addition, the consequences of appellate findings on manifest weight as opposed to sufficiency are different. "[T]he Double Jeopardy Clause does not preclude retrial of a defendant if the reversal was grounded upon a finding that the conviction was against the weight of the evidence. However, retrial is barred if the reversal was based upon a finding that the evidence was legally insufficient to support the conviction." *Id,* at 387, citing *Tibbs* at 47.

{¶ 28} In Ohio, the offense of rape is defined by statute in relevant part as follows:

> No person shall engage in sexual conduct with another when the offender purposely compels the other person to submit by force or threat of force.

No. 15AP-926

R.C. 2907.02(A)(2). "Sexual conduct" is defined to include "the insertion, however slight, of any part of the body or any instrument, apparatus, or other object into the vaginal or anal opening of another" when accomplished "without privilege to do so." R.C. 2907.01(A). In addition, a person is complicit in the sense potentially relevant here when, "acting with the kind of culpability required for the commission of an offense" the person "[a]id[s] or abet[s] another in committing the offense." R.C. 2923.03(A)(2). A person who is complicit in an offense "shall be prosecuted and punished as if he were a principal offender." R.C. 2923.03(F).

{¶ 29} A.B. testified that someone in the house (she was not sure who) held a gun on her and B.P. Someone (it is not clear from her testimony if it was the same unknown person or a different unknown person) told her to strip. A.B. testified that someone, she was not sure who, administered a vaginal cavity search in the kitchen and that Minor performed anal and vaginal cavity searches on her once she had stripped and gone into the basement of 125 North Harris Avenue.[4] A.B. identified Clark as one of the people being on the premises on North Harris Avenue with Minor both by line-up and at trial.

{¶ 30} A.B. testified that in the period in which she was detained in the basement of 125 North Harris Avenue, Clark was one of the people who came to check and make sure she was still there; however, A.B. did not claim that Clark was present at the scene (or even in the house) during the cavity searches she experienced.[5] Indeed her first mention of Clark was in connection with the beating of B.P. which occurred after all of the cavity searches. Moreover, she agreed that Clark was not an assailant as to her and, in fact, never touched her at all. She also stated, that the gun had been put away and was not out at the point when the cavity searches in the basement occurred.

{¶ 31} "Body cavity search" is defined in two places in the Ohio Revised Code. In both instances it is defined as "an inspection of the anal or vaginal cavity of a person that is conducted visually, manually, by means of any instrument, apparatus, or object, or in any other manner." R.C. 2933.32(A)(1); R.C. 5120.421(A)(1). Black's Law Dictionary

---

[4] She also testified that some unknown persons performed cavity searches on B.P. as well. However, Clark was convicted only of rape counts associated with the penetration of A.B.'s anal and vaginal cavities; thus, we address that issue no further here.

[5] While A.B. also maintained that B.P. was sodomized with a broom handle, Clark was convicted only of rape counts associated with the penetration of A.B.'s anus and vagina.

defines two types of body cavity searches. A "manual body-cavity search" is "[a] strip search in which the police engage in some touching or probing of a person's orifices. – Also termed *digital body-cavity search.*" (Emphasis sic.) *Black's Law Dictionary* 1552 (10th Ed.2014). A "visual body-cavity search" is "[a] strip search in which, without touching, a law-enforcement officer closely inspects a person's orifices. – Also termed *visual body-cavity inspection.*" (Emphasis sic.) *Black's* at 1553. In other words, although a body cavity search clearly can involve penetration, it does not, by definition, require or necessitate penetration or insertion.

{¶ 32} A.B.'s testimony at least suggested that penetration occurred because she referred to being cavity searched with a gloved hand. Taken in combination with the fact that the hospital records introduced in the case show representations that vaginal and "butt" penetration occurred, we find the evidence before the jury sufficient, when taking the view most favorable to the prosecution, for a jury to find there was evidence that some penetration occurred. The force element is satisfied by evidence that A.B. was compelled at gunpoint to strip in preparation for the search. Although the gun was later put away, taking the view of the facts most favorable to the prosecution, Minor took advantage of the continuing implied threat of violence when he required A.B. to submit to cavity searches in the basement, shortly after she was forced at gunpoint to strip. Thus, taking the view of the evidence most favorable to the prosecution, the evidence was sufficient to find Minor guilty of the rapes. However, utterly lacking in the presentation at trial was any evidence that Clark was involved in the cavity searches or even present at 125 North Harris Avenue when the cavity searches were conducted.

{¶ 33} The testimony at trial regarding Clark's participation in the rapes is as follows:

> Q. What was [Clark's] involvement that night?
>
> A. He was involved in beating [B.P.]
>
> Q. Did he have any involvement with any of the cavity searches?
>
> A. I believe so. But I am not sure because I was searched from behind, so I don't know.
>
> * * *

No. 15AP-926

> Q. [Clark]. What was his involvement?
>
> A. Beating [B.P.]
>
> * * *
>
> Q. Ms. [A.B.], Mr. Clark, again, to reiterate, never sexually assaulted you, correct?
>
> A. Correct.
>
> Q. To your knowledge, you never recall him doing anything physical to you, correct?
>
> A. Correct.
>
> * * *
>
> Q. [Clark], he is not an assailant either, is that correct? Your testimony is he never touched you, correct?
>
> A. Yes.
>
> * * *
>
> Q. I think one of the points was clarified, but when you were asked the question about [Clark] wasn't an assailant to you. Was he an assailant to [B.P.]?
>
> A. Yes.

(Tr. Vol. 2 at 153, 155, 220, 255, 259-60.) The first mention of Clark by A.B. appears on page 128 of the trial transcript at which point she stated that Minor and Clark were beating B.P. When defense counsel suggested that A.B. might have told the police that Clark was present at the house at the time when she arrived (and thus might have been there for the cavity searches which preceded the beating of B.P.) she claimed she did not remember.

{¶ 34} The State argues that Clark was complicitous to the rape perpetrated by Minor. While " 'participation in criminal intent may be inferred from presence, companionship and conduct before and after the offense is committed.' " *State v. Johnson*, 93 Ohio St.3d 240, 245 (2001), quoting *State v. Pruett*, 28 Ohio App.2d 29, 34 (4th Dist.1971). *Black's Law Dictionary* defines "inference" as, "[a] conclusion reached by considering other facts and deducing a logical consequence from them." *Black's* at 897. It

also defines "inferential fact" as, "[a] fact established by conclusions drawn from other evidence rather than from direct testimony or evidence; a fact derived logically from other facts." *Black's* at 710. Notably missing from these definitions is any suggestion that the concept of an "inference" can be expanded to include assumptions of fact where there is no evidence for the fact assumed.

{¶ 35} Here, Clark's presence and participation in the beating of B.P. and continued presence in the basement show quite clearly that he had the requisite criminal intent for hurting B.P. and holding B.P. and A.B. upon the suspicion that they had stolen heroin. But there is simply no evidence offered that would tend to show that Clark was present for or even knew of a plan to cavity search A.B. and B.P. or even the fact that they had been cavity searched, however the act of rape may be defined. Even if Clark *was* present during the cavity searches and fully concurred in the criminal intent behind them, without some evidence to support an inference tending toward his complicity, the evidence before the jury was insufficient to convict him. *See Johnson* at 243, quoting *State v. Widner*, 69 Ohio St.2d 267, 269 (1982) (" '[T]he mere presence of an accused at the scene of a crime is not sufficient to prove, in and of itself, that the accused was an aider and abettor.' ").

{¶ 36} Clark's first assignment of error is sustained.

### B. Second, Third, and Fourth Assignments of Error—Moot

{¶ 37} Having determined to vacate Clark's convictions for rape because the evidence introduced at trial was insufficient on those counts, Clark's remaining assignments of error which also bear on the rape counts are moot and shall not be considered further.

## IV. CONCLUSION

{¶ 38} We sustain Clark's first assignment of error because we find that the evidence introduced at trial was insufficient to support Clark's conviction for rape; thus the two convictions for rape are vacated. Pursuant to App.R. 12(A)(1)(a), we modify the judgment entry of the trial court to remove the convictions and sentences for rape (7 years each) leaving a total remaining sentence of 21 years. We remand for consideration of whether Clark should be considered to have been convicted of a "sexually oriented offense" under R.C. 2950.01(A)(7) as to his kidnapping convictions for the purposes of

No. 15AP-926

sexual offender registration.  Clark's remaining three assignments of error are moot and not considered further.

*Judgment reversed in part*
*and remanded with instructions.*

DORRIAN, P.J., and SADLER, J., concur.

———————————