**[Cite as *State v. Cook*, 2020-Ohio-2844.]**

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

State of Ohio,                                          :

      Plaintiff-Appellee,                    :

                                        No. 19AP-353

v.                                                        :     (C.P.C. No. 18CR-2897)

Mondell A. Cook,                                    :          (REGULAR CALENDAR)

      Defendant-Appellant.                  :

D E C I S I O N

Rendered on May 7, 2020

**On brief:** *Ron O'Brien*, Prosecuting Attorney, and *Sarah V. Edwards*, for appellee.

**On brief:** *Todd W. Barstow*, for appellant.

APPEAL from the Franklin County Court of Common Pleas

SADLER, P.J.

{¶ 1} Defendant-appellant, Mondell A. Cook, appeals from a judgment of the Franklin County Court of Common Pleas convicting him of aggravated burglary and receiving stolen property. For the reasons that follow, we affirm.

## I. FACTS AND PROCEDURAL HISTORY

{¶ 2} In 2018, Whitney Burris, Erin Stynchula, and Amber White were roommates living in a rented home at 1074 Summit Street in Columbus, Ohio. On the evening of April 19, 2018, Burris awakened to the sound of breaking glass. Burris grabbed her phone and texted both of her roommates at approximately 10:40 p.m. to ask if they heard anything. White was asleep and did not respond. Stynchula had just left the residence a

few minutes earlier with her boyfriend, Phillip Catlin, and she received the text while they were still in the neighborhood.

{¶ 3}  When Burris again heard the sound of glass breaking, she locked her bedroom door, hid under her bed, and continued to send text messages to her roommates. Burris heard footsteps coming up the stairs and saw someone using a flashlight. The intruder shined the flashlight under Burris's bedroom door and then tried the doorknob but did not enter. She then texted Stynchula to "call the cops." (Burris Dep. at 15.)

{¶ 4}  After receiving the alarming text messages from Burris, Stynchula called the police and she and Catlin drove back to Stynchula's residence. When they arrived, Catlin walked around to the back of the house while Stynchula, who was now on the phone with police, stayed by the front door. As she was standing on the front landing, Stynchula heard several footsteps from inside the home approaching the front door. According to Stynchula, a man, later identified as appellant, unlocked the front door and ran out of the house straight at her. Stynchula stated appellant emerged from the house and proceeded to run into her, propelling her off the landing. At trial, Stynchula testified about the encounter with appellant as follows:

> Q. Can you describe for us the opportunity that you had to view the person who pushed you, who was coming out of residence?
>
> A. Yeah.  So I was standing on flat ground, and there was a very little step into the door, so the door was pretty well flat. So when the door opened, the individual was about my height and immediately in my face, so I probably had three to five seconds to view him at that point before I was pushed down.
>
> Q. And in your review of that individual, was it from the side, from the front?
>
> A. Directly at the front.  There's only one way in and out of that door, and it would be directly facing, and he was directly facing me.
>
> Q. Okay.  So you had an opportunity to look at that person directly?
>
> A. Yes.

(Tr. Vol. I at 79-80.)

{¶ 5}  Stynchula testified that after appellant ran into her, she landed on the ground, and the phone flew out of her hand. The 911 recording was played for the jury

during Stynchula's testimony and, on the tape, Stynchula can be heard grunting as appellant ran into her and then screaming.

{¶ 6} Officers from the Columbus Police Department ("CPD") arrived at the scene just moments after appellant fled. Officer Carl Harmon testified at trial about his initial encounter with Stynchula:

> Q. Okay. Did you eventually meet with a woman by the name of Erin Stynchula?
>
> A. Yes, ma'am.
>
> Q. And when you met with her, what did you do?
>
> A. My partner, at that point, after realizing that they're safe and the suspect is no longer on the scene -- because it's a priority-one call, other officers would be coming. I wanted to get at least a brief description so I could air it so other officers that might be responding, if they saw a suspect fleeing, could make an apprehension.
>
> Q. Okay. And do you recall what the description was that Ms. Stynchula provided to you so that you can air that information?
>
> A. Yes, ma'am. It was male, black, with a gray or khaki hoodie.
>
> Q. And did she give an approximate age?
>
> A. Yes, ma'am. Later on she said about 40. 40.
>
> Q. Okay. All right. Based on that information, what, if anything, did you do with that information?
>
> A. She -- I aired it. I said, "Suspect left northbound approximately 30 seconds ago." And he was a male; black, khaki hoodie. And I also added -- she added that she thought like a floral backpack of hers had been stolen, and so I added that description as well.

(Tr. Vol. II at 192-93.)

{¶ 7} Stynchula also told Harmon the suspect had short hair or was wearing a hat, he "wasn't skinny" and "wasn't stocky," and he weighed about 200 pounds. (Tr. Vol. II at 171.) When Harmon was asked whether Stynchula told him she could identify the perpetrator if she saw him again, Harmon responded: "She was very -- very positive. She said very clearly, 'I can pick him out if I saw him.' " (Tr. Vol. II at 207.) She also told the

officers that her wallet was missing from her backpack and that both her laptop and Burris's laptop had been moved but not taken.

{¶ 8} Stynchula called her credit card company to report the theft of credit cards. The morning after the theft, Stynchula was contacted by the credit card company and informed that one small purchase of approximately $6.00 had been made at a local Sunoco and that two other charges, one at UDF and another at Walmart, had been declined. The declined transaction at the local Walmart occurred at 3:25 a.m. and was for $325.34 on Stynchula's stolen American Express card.

{¶ 9} CPD Detective Mark Ryan was the primary investigator on the case, and he went to the victims' home at 10:15 a.m. on April 20, 2018 to interview the victims. According to Ryan, Stynchula provided the following description of the suspect:

> She described him as an Africa-American male. I believe about '5'8, somewhere between 160 and 180 pounds. And she described his clothing as, like, a work uniform. And she relayed that there was some sort of, like, tan shirt protruding outward from this uniform-type jacket or shirt. She could not describe facial hair, but she was able to describe some unusual shorter dreadlocks. She described them as dreadlocks to me.

(Tr. Vol. II at 313.)

{¶ 10} After the interview, Stynchula sent an email to Ryan containing her credit card numbers and the information she received from American Express, including the time of the attempted Walmart purchase. Ryan followed up by visiting the Walmart store and speaking with Walmart asset protection associate Sean Allton. Allton told Ryan that a purchase of $325.34 had been attempted on a credit card belonging to Stynchula and that the receipt was on his desk when he arrived for work on April 20, 2018. The identification number on the credit card, ending 0704, matched Stynchula's stolen card. Ryan left the store with the receipt, and he later obtained a copy of the Walmart surveillance video that captured the transaction. Several still photographs and a short video clip were excerpted from the surveillance footage, copied to a video disc, and admitted into evidence as State's Exhibit E-1. State's Exhibit E-1 shows a man fitting appellant's description and an unidentified female checking out items at the self-checkout line. Though the female suspect is the individual who appears to be in possession of the credit card, the male suspect can be seen running some items through the scanner.

{¶ 11} Ryan testified he instructed the CPD public information officer to post a still photograph of the suspect as he exited the Walmart store on the CPD Facebook page. (State's Ex. E-4.) Ryan felt the man shown in the Walmart photograph bore a "striking resemblance" to the description of the suspect provided to him by Stynchula. (Tr. Vol. II at 329.)

{¶ 12} At some point thereafter, Ryan received a tip that appellant was the man in the photograph posted on the CPD Facebook page. When Ryan obtained a color photograph of appellant and compared the likeness to the man in the still photograph taken from the Walmart video, he believed the two photographs showed the same individual. Ryan then prepared a photo array to be shown to Stynchula for purposes of identification. According to Ryan: "Photo arrays consists of six photographs. It's also known as a 'six pack.' So we put the Defendant in the photo array with other similar pictures. And we try to match the characteristics as much as we can based on what we have." (Tr. Vol. II at 341.)

{¶ 13} Pursuant to CPD policy, Ryan asked another detective, Ron Keller, to administer the photo array to Stynchula. According to Ryan, neither Keller nor Stynchula knew whether the suspects photograph was in the array. On June 7, 2018, Keller went to Stynchula's home to administer the photo array. Keller testified that after reading the prescribed preliminary instructions to Stynchula, he showed her the array. Stynchula "immediately" picked out the photograph at position number one in the array and told Keller "[t]hat's him." (Tr. Vol. III at 418, 419.) Stynchula circled appellant's photograph and placed her initials and the date next to the circled photograph. (State's Ex. G-1; Tr. Vol. I at 126.)

{¶ 14} At trial, Stynchula acknowledged that she knew the CPD posted information about the crime on its Facebook page, but she "un-followed" the CPD Facebook page after the crime. (Tr. Vol. I at 118.) Stynchula testified, however, that on May 15, 2018, an acquaintance showed her the photograph on a telephone. Stynchula stated that she did not ask to see the photograph, that she saw it "three to five seconds," and that she did not read any of the information accompanying the photograph. (Tr. Vol. I at 120.) Stynchula did not tell Keller or Ryan she had seen the Facebook photograph prior to making the photographic identification pursuant to the photo array.

{¶ 15} On June 15, 2018, a Franklin County Grand Jury indicted appellant for aggravated burglary, in violation of R.C. 2911.11, a felony of the first degree; burglary, in violation of R.C. 2911.12, a felony of the second degree; and receiving stolen property, in violation of R.C. 2913.51, a felony of the fifth degree. On October 26, 2018, appellant filed a motion to suppress Stynchula's identification of appellant from the photographic lineup arguing that the CPD did not follow the method prescribed by R.C. 2933.83, and the lineup photographs were unduly suggestive. On December 7, 2018, the trial court denied the motion.

{¶ 16} The case against appellant was tried to a jury, and the jury convicted appellant of all charges. At the sentencing hearing, the trial court determined the offenses of aggravated burglary and burglary were allied offenses of similar import, merged those two offenses, and convicted appellant of aggravated burglary and receiving stolen property. On May 2, 2019, the trial court sentenced appellant to consecutive prison terms of 5 years for aggravated burglary and 12 months for receiving stolen property, for an aggregate sentence of 6 years in prison.

{¶ 17} Appellant timely appealed to this court from the judgment of the trial court.

## II. ASSIGNMENT OF ERROR

{¶ 18} Appellant assigns the following as trial court error:

> THE TRIAL COURT ERRED AND DEPRIVED APPELLANT OF DUE PROCESS OF LAW AS GUARANTEED BY THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND ARTICLE ONE SECTION TEN OF THE OHIO CONSTITUTION BY FINDING HIM GUILTY OF AGGRAVATED BURGLARY; BURGLARY AND RECEIVING STOLEN PROPERTY AS THOSE VERDICTS WERE NOT SUPPORTED BY SUFFICIENT EVIDENCE AND WERE ALSO AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

## III. STANDARD OF REVIEW

{¶ 19} In a sufficiency of the evidence inquiry, appellate courts do not assess whether the prosecution's evidence is to be believed but whether, if believed, the evidence supports the conviction. *State v. Yarbrough*, 95 Ohio St.3d 227, 2002-Ohio-2126, ¶ 79-80 (evaluation of witness credibility not proper on review for sufficiency of evidence); *State v. Bankston*, 10th Dist. No. 08AP-668, 2009-Ohio-754, ¶ 4 (noting that "in a sufficiency of

the evidence review, an appellate court does not engage in a determination of witness credibility; rather, it essentially assumes the state's witnesses testified truthfully and determines if that testimony satisfies each element of the crime"). "Further, 'the testimony of one witness, if believed by the jury, is enough to support a conviction.' " *State v. Patterson*, 10th Dist. No. 15AP-1117, 2016-Ohio-7130, ¶ 33, quoting *State v. Strong*, 10th Dist. No. 09AP-874, 2011-Ohio-1024, ¶ 42. *See also State v. Clark*, 10th Dist. No. 15AP-926, 2016-Ohio-5493, ¶ 25.

{¶ 20} "When presented with a manifest-weight challenge, an appellate court may not merely substitute its view for that of the trier of fact but must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Patterson* at ¶ 34, citing *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997), citing *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983). An appellate court should reserve reversal of a conviction as being against the manifest weight of the evidence for only the most " 'exceptional case in which the evidence weighs heavily against the conviction.' " *Thompkins* at 387, quoting *Martin* at 175.

{¶ 21} In conducting a manifest weight of the evidence review, we may consider the credibility of the witnesses. *State v. Kurtz*, 10th Dist. No. 17AP-382, 2018-Ohio-3942, ¶ 15; *State v. Cattledge,* 10th Dist. No. 10AP-105, 2010-Ohio-4953, ¶ 6. However, in conducting such review, "we are guided by the presumption that the jury, or the trial court in a bench trial, 'is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony.' " *Cattledge* at ¶ 6, quoting *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984). "Accordingly, we afford great deference to the jury's determination of witness credibility." *State v. Albert*, 10th Dist. No 14AP-30, 2015-Ohio-249, ¶ 14. "Mere disagreement over the credibility of witnesses is not a sufficient reason to reverse a judgment on manifest weight grounds." *State v. Harris*, 10th Dist. No. 13AP-770, 2014-Ohio-2501, ¶ 25, *appeal not allowed*, 140 Ohio St.3d 1455, 2014-Ohio-4414, citing *State v. G.G.*, 10th Dist. No. 12AP-188, 2012-Ohio-5902, ¶ 7.

## IV. LEGAL ANALYSIS

{¶ 22} In appellant's sole assignment of error, appellant contends plaintiff-appellee, State of Ohio, presented insufficient evidence to support a finding by the jury that appellant was the man who committed the burglary on April 19, 2018 and that his conviction of aggravated burglary was against the manifest weight of the evidence. Appellant also contends appellee presented insufficient evidence to support a finding by the jury that appellant was the man who committed the offense of receiving stolen property on April 20, 2018 and that his conviction of receiving stolen property was against the manifest weight of the evidence. We are not persuaded by appellant's arguments.

### A. Aggravated Burglary

{¶ 23} Appellant first contends that because the description of the suspect Stynchula gave to Harmon on the night of the crime differed from the description she gave to Ryan the next morning, no reasonable trier of fact could believe her testimony that appellant was the man who burglarized her home. We disagree.

{¶ 24} " 'In reviewing the "manifest weight of the evidence, this court frequently has held that, even where discrepancies exist, eyewitness identification testimony alone is sufficient to support a conviction so long as a reasonable juror could find the eyewitness testimony to be credible." ' " *State v. Thompson*, 10th Dist. No. 14AP-488, 2015-Ohio-655, ¶ 29, quoting *State v. Humberto*, 196 Ohio App.3d 230, 2011-Ohio-3080, ¶ 12 (10th Dist.), quoting *State v. Jordan*, 10th Dist. No. 04AP-827, 2005-Ohio-3790, ¶ 14. "The reliability of identification is assessed by considering the witness's opportunity to view the defendant at the time of the incident, the witness's degree of attention, the accuracy of the witness's prior description of the suspect, the witness's certainty, and the length of time which elapsed between the crime and the identification." *State v. Pierce*, 10th Dist. No. 02AP-1133, 2003-Ohio-4179, ¶ 65.

{¶ 25} Here, the evidence shows that, at some point during his investigation, Ryan viewed the video recorded on Harmon's body camera on the night of the burglary. Ryan admitted on cross-examination that the description of the perpetrator Stynchula gave to Harmon differed in some respects from the description she gave him the next morning. Ryan testified as follows:

Q. * * * When you did have an opportunity to see the body -- to see the video, did you -- did you notice any differences with the description of the suspect that was given to you?

A. I believe a -- the weight was a little off, how heavy he was. If I can recall, I don't know exactly, but there was a slight difference. There was a difference in there, in her description of the clothing, I believe.

Q. Okay. Exactly. In the description of the clothing, did you note that in the body camera -- in the video from Officer Harmon that there was nothing said about a work uniform?

A. I believe that's correct.

(Tr. Vol. II at 357-58.)

{¶ 26} Though Ryan did acknowledge inconsistencies in Stynchula's descriptions of appellant on cross-examination, his testimony on direct examination provided the jury with a reasonable explanation for the inconsistencies. First, Ryan referred to the description Stynchula gave to Harmon on the night of the incident as "very generic." (Tr. Vol. II at 361.) This assertion is corroborated by Harmon, who stated he obtained a brief description of the suspect so he could air it to other officers searching for the suspect in the area. Additionally, when Ryan was asked why he obtained a description of the suspect from Stynchula during his interview even though Stynchula had previously given a description to Harmon, Ryan explained:

> The purpose is to just really get a better feel. And a lot of times after a traumatic event, they'll be able to settle down, relay information. And I need -- in this case, I really needed to go out there with the evidence tech. And a victim like Ms. Stynchula will show, "Hey, this is where we believe this person was." And, you know, I'll be able to get that information immediately.

(Tr. Vol. II at 315.)

{¶ 27} When asked why Stynchula gave a more detailed description of the suspect during his interview, Ryan explained:

> A lot of times, if you have a -- when I was in patrol, you meet somebody who was a witness to something or a victim of something, information is coming at you quick and you may not be able to settle that person down. And these guys respond on runs, make their phone calls, and they go to another run. And so that's what I anticipate when I go out to

do an interview, "Okay. Let's slow things down. Let's go through it again."

(Tr. Vol. II at 316.)

{¶ 28} Based on Ryan's testimony, the jury could have reasonably concluded Stynchula's confusion about certain details, such as the type of clothing appellant was wearing and/or the color of his clothing, did not seriously undermine her subsequent identification of appellant as the man who burglarized her home. As previously noted, Stynchula got a good look at appellant's face from the well-lit landing outside the front door for a period of three to five seconds before appellant knocked her to the ground. Stynchula also testified she concentrated on the perpetrator's face so she could provide a description to law enforcement. On this record, we conclude a reasonable juror could find Stynchula's identification testimony credible even though there were some inconsistencies in the descriptions she gave to Harmon and Ryan. The jury was in the best position to resolve any inconsistencies in the two descriptions in judging the weight and credibility of Stynchula's subsequent photographic identification of appellant as the man who burglarized her home.

{¶ 29} Appellant nevertheless contends Stynchula's identification of appellant, pursuant to the photo array, was unworthy of belief because the photographs used in the array were so dissimilar to appellant. More particularly, appellant claims that because the other five individuals in the array did not have the same unique hairstyle as appellant, the array was unduly suggestive. We disagree.

{¶ 30} Appellant's trial counsel questioned Ryan about the quality of the photo array:

> Q. This is not what you would use as an example to teach that this is a perfect photo array, correct?
>
> A. That's a perfect example of what we do is there are characteristics in your suspect, and you try your best to match them up. And based on a haircut that most of my son's friends have, it was difficult to match a guy with salt and pepper hair with that type of haircut with the other gentlemen.

(Tr. Vol. II at 364.)

{¶ 31} Ryan acknowledged on cross-examination that "[n]o photo array is perfect," and he agreed with defense counsel that it would have been a better photo array if he could have found five other individuals in appellant's age range with similar hairstyles. (Tr. Vol.

II at 364.)  Nevertheless, " '[a] defendant in a [photographic] lineup need not be surrounded by people nearly identical in appearance,' [so long as] the other five photos in the array are all reasonably close to appellant's photo in appearance, showing no significant variations in hair length, complexion, age, features, or dress." *State v. Murphy,* 91 Ohio St.3d 516, 534 (2001), quoting *State v. Davis*, 76 Ohio St.3d 107, 112 (1996).  Our review of the photographs in the array reveals the other five individuals depicted share the same basic characteristics as appellant.  All the individuals depicted appear to be African-American men in the same age range as appellant with short hair, casual clothing, and similar facial features.  We also agree with Stynchula's assessment in her trial testimony that the photographs in positions four, five, and six show individuals with short corn rolls similar to appellant's hairstyle.  In our view, the photo array is not unduly suggestive of appellant and did not create a danger of misidentification.

{¶ 32} Appellant's final challenge to Stynchula's photographic identification of appellant is that the identification was tainted because Stynchula had previously seen the still photograph taken from the Walmart video on the CPD Facebook page.  Stynchula testified, however, that viewing the Facebook photograph had no impact on her subsequent identification of appellant from the phot array:

> Q. Ms. Stynchula, what impact or influence, if any, did seeing the Facebook posting approximately a month earlier for three to five seconds have in influencing your viewing of the photograph array that was shown to you by the Columbus police and in influencing your decision to pick photo number one as the person who had knocked you down as he was exiting your residence?
>
> A. I do not believe it had an impact.
>
> Q. Why not?
>
> A. The view of the photograph array is straight on, just as he was straight on coming at me, so the view was comparable.  The picture from Facebook is grainy and not -- no on face; it's more overhead.  The photo array is just very clear and gives the visual of the individual who was coming out the door.

 (Tr. Vol. I at 127-28.)

{¶ 33} On cross-examination, Ryan acknowledged there was a "possibility" that Stynchula's photographic identification could have been influenced by her viewing the still

photograph on the CPD Facebook page. (Tr. Vol. II at 376.) Ryan nevertheless testified on redirect that given the circumstance under which Stynchula saw the photograph, he was not concerned about the legitimacy of her subsequent identification of appellant from the photo array.

{¶ 34} As previously noted, this court has repeatedly held that eyewitness identification testimony alone is sufficient to support a conviction. *Thompson*, 2015-Ohio-655, at ¶ 29; *Humberto*, 2011-Ohio-3080, at ¶ 12; *Jordan*, 2005-Ohio-3790, at ¶ 14. In this case, Stynchula's eyewitness identification of appellant as the man who burglarized her home on April 19, 2018 is sufficient to support the jury's guilty verdict on the charge of aggravated burglary beyond a reasonable doubt. Stynchula was face-to-face with appellant from no more than one foot away, in a well-lit landing, for a period of three to five seconds before appellant knocked her to the ground. She also testified she concentrated on appellant's face so she could give a description to law enforcement. Stynchula subsequently made an in-court identification of appellant as the male who burglarized her home on April 18, 2018. Accordingly, we hold Stynchula's identification of appellant as the perpetrator provided sufficient evidence to support appellant's conviction of aggravated burglary beyond a reasonable doubt.

{¶ 35} In reviewing the manifest weight of the evidence, we have repeatedly held that a conviction based on an eyewitness identification, even where discrepancies exist, will be upheld so long as a reasonable juror could find the eyewitness testimony to be credible. *Thompson* at ¶ 29; *Humberto* at ¶ 12; *Jordan* at ¶ 14. Here, as explained above, in determining Stynchula's credibility, the jury was presented with ample information on which they could resolve relatively minor inconsistencies between Stynchula's initial description of appellant to Harmon and the more detailed description she gave to Ryan. Similarly, the jury was in the best position to evaluate the alleged deficiencies in the construction and implementation of the photographic lineup in determining whether to believe Stynchula's photographic identification of appellant as the burglar.

{¶ 36} Based on the foregoing, we hold that appellant's conviction of aggravated burglary was supported by sufficient evidence and was not against the manifest weight of the evidence.

**B. Receiving Stolen Property**

{¶ 37} The offense of receiving stolen property is defined in R.C 2913.51(A) as follows: "No person shall receive, retain, or dispose of property of another knowing or having reasonable cause to believe that the property has been obtained through commission of a theft offense." Receiving stolen property is not a lesser-included offense of aggravated burglary. *State v. West*, 2d Dist. No. 2744 (Sept. 30, 1991); *State v. Vaughn*, 7th Dist. No. 87 C.A. 50 (May 17, 1990). Accordingly, a trial court should merge the offenses of burglary and receiving stolen property, pursuant to R.C. 2941.25, when defendant commits all three crimes by trespassing in a residence with the intent to steal a television, steals the television, and retains it. *State v. Blackburn*, 4th Dist. No. 10CA46, 2011-Ohio-4624.

{¶ 38} Appellant essentially concedes State's Exhibit E-1 provided sufficient evidence for the jury to conclude appellant was the man accompanying the unidentified female suspect as she attempted to purchase items using Stynchula's stolen credit card. Appellant was sitting in the courtroom as the jury viewed State's Exhibit E-1. Appellant argues, however, that insufficient evidence was presented to support his conviction of receiving stolen property, beyond a reasonable doubt, because State's Exhibit E-1 does not clearly show appellant in possession of the stolen credit card when the purchase was attempted. Appellant's argument is without merit.

{¶ 39} For purposes of the offense of receiving stolen property, possession of stolen items may be actual or constructive. *State v. Sherfey*, 5th Dist. No. 13-CA-37, 2014-Ohio-1717, ¶ 34.[1] Circumstantial evidence that the defendant was located in very close proximity to the contraband may show constructive possession. *Id.* Furthermore, multiple individuals may constructively possess a particular item of contraband simultaneously, as constructive possession may be individual or joint. *Id.*

{¶ 40} As set forth above, the evidence shows appellant left Stynchula's residence with a stolen American Express credit card bearing her name with the last four digits 0704.

---

[1] R.C. 2925.01(K) defines possession as follows: " 'Possess' or 'possession' means having control over a thing or substance, but may not be inferred solely from mere access to the thing or substance through ownership or occupation of the premises upon which the thing or substance is found." For purposes of criminal liability, R.C. 2901.21(F)(1) defines "possession" as a "voluntary act if the possessor knowingly procured or received the thing possessed, or was aware of the possessor's control of the thing possessed for a sufficient time to have ended possession."

State's Exhibit E-1 shows that a few hours after the burglary, a man fitting appellant's description and an unidentified female attempted to purchase items at a nearby Walmart using the same stolen American Express credit card. State's Exhibit E-1 also shows the man fitting appellant's description helping the unidentified female scan some of the items through the self-checkout aisle before the unidentified female attempts to use the stolen credit card as payment. Accordingly, even if we were to agree that State's Exhibit E-1 does not clearly show appellant had physical possession of the stolen credit card at the time the purchase was attempted, the exhibit leaves little doubt that, at a minimum, appellant constructively possessed the stolen credit card simultaneously with the unidentified female as she attempted to use the credit card as payment.

{¶ 41} Based on the foregoing, we hold appellant's conviction of receiving stolen property was supported by sufficient evidence and was not against the manifest weight of the evidence. Accordingly, appellant's assignment of error is overruled.

**V. CONCLUSION**

{¶ 42} Having overruled appellant's sole assignment of error, we affirm the judgment of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

BROWN and KLATT, JJ., concur.

_____